704 F.2d 275
 1983 O.S.H.D. (CCH) P 26,495
 Wayne BOICH, d/b/a W.B. Coal Company, Petitioner,
v.
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, and
Richard W. Neal, Jr., Respondents,
and
Raymond J. Donovan, Secretary of Labor, Intervenor.
 No. 81-3186.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 27, 1982.
Decided April 5, 1983.
 
 R. Henry Moore (argued), Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for petitioner.
 Dennis D. Clark, James A. Lastowka, Federal Mine Safety and Health Review Com'n, Washington, D.C., Thomas A. Mascolino, U.S. Dept. of Labor, Arlington, Va., Morton Hollander, Chief, U.S. Dept. of Justice, Appellate Section, Civil Div., Washington, D.C., for respondents.
 Ann S. Rosenthal, Michael A. McCord, U.S. Dept. of Labor, Arlington, Va., for intervenor.
 Stanley G. Burech (argued), St. Clairsville, Ohio, for respondent Neal.
 Before ENGEL and CONTIE, Circuit Judges, and TAYLOR, District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 This case comes to us on cross-petitions for review and enforcement of an order of the Federal Mine Safety and Health Review Commission ("the Commission") determining that W.B. Coal violated section 105 of the Federal Mine Health and Safety Act of 1977, 30 U.S.C. Sec. 815 (Supp.1981) ("the Mine Act") by discharging an employee, Richard Neal, for answering questions of safety inspectors concerning alleged safety violations committed by the company and himself. The question before this court is whether the Commission applied the proper test in evaluating alleged discriminatory activity where "mixed motives" are involved and whether, under that test, substantial evidence supports the Commission's conclusion that Neal was fired because he engaged in the protected activity of reporting the violations to the Commission.
 
 
 2
 Neal originally was employed by W.B. Coal as a blaster on May 5, 1978, and he later worked as a driller and bulldozer operator at petitioner's coal mine. On February 16, 1979, the bulldozer to which he was assigned developed mechanical problems, and Neal took it to the equipment parking area for repairs. Finding no mechanics in the area, Neal then took a 631-B pan scraper to the site where he had been working, which was located on rugged terrain and was adjacent to a pit. Although he had little experience operating the equipment, Neal proceeded to haul dirt to the stockpiling area using the scraper. After two or three trips, Neal skidded on some ice located on the road, hit a bank, and slid backwards, flipping over and into a pit. Neal sustained injuries which caused him to be hospitalized for several days. The estimated damage to the machine was approximately $19,000.00. After the accident, Neal climbed out of the scraper and approached foreman Alfred Haverfield, who drove him to the hospital. Neal told Haverfield that he had been operating the machine with the bowl raised and without a seat belt, information which Haverfield asserted he relayed on February 16 to W.B. Coal's superintendent, Richard Lynch. Lynch investigated the accident that day and concluded that Neal was using the scraper without permission as the company required and that he was negligent in operating the scraper with the bowl raised.
 
 
 3
 Lynch signed a Mine Safety and Health Administration ("MSHA") accident form the following day, February 16, indicating that the accident was caused in part because the scraper bowl was carried too high for safety.[1] On the following Monday, Lynch discussed the possibility of firing Neal with Maxwell Sovell, who was then Manager and Vice President as well as Safety Director of the mining company. Sovell agreed that Neal's actions warranted his dismissal, but indicated that the final decision was for Lynch to make. Neal had a good employment record and had never been disciplined.
 
 
 4
 MSHA inspector Ray Marker learned of the accident on Sunday, February 18. He and regular mine inspector Poe investigated the mine on February 20 and issued two citations: one for failing to report the accident immediately and one for maintaining improper berms along the edge of the roadway.
 
 
 5
 On Wednesday, February 21, the inspectors spoke with Neal at the hospital. Neal told them that he was not wearing a seat belt and that he believed that the scraper brakes were defective. The inspectors then issued a second citation to W.B. Coal for Neal's failure to wear the seat belt and ordered the company to fix the brakes of the scraper prior to its reuse. Lynch asked the inspectors how they had learned that Neal was not wearing his seat belt and was informed that Neal had so advised them. Lynch then phoned Neal and asked him if he had volunteered this information. Neal answered that he had. Some time after this discussion Lynch decided to fire Neal, claiming that his activities warranted his dismissal. Neal received actual notice of his dismissal upon his return to work on March 19, 1979. The notice listed three reasons: (1) unauthorized use of equipment; (2) unsafe operation of the scraper; and (3) failure to use a seat belt. The company's work rules prohibited all three activities.
 
 
 6
 Following his dismissal, Neal filed a complaint with the MSHA alleging that he had been discharged for engaging in activities protected under the Mine Act. On November 16, 1979, MSHA informed Neal that it found no violation of the Act and that he had thirty days to file his own action with the Commission.[2] Neal filed his complaint with the Commission on November 23, 1979.
 
 
 7
 After an extensive hearing, an Administrative Law Judge ("ALJ") determined that W.B. Coal had violated section 105(c) of the Act, 30 U.S.C. Sec. 815(c) (Supp.1981), by firing Neal for the protected activity of reporting the safety violations. He ordered the company to reinstate Neal and provide him with backpay, costs and attorney fees. The Commission declined to review the decision, which therefore became final on March 24, 1981. These cross-petitions followed.
 
 
 8
 Section 105(c)(1) of the Act, 30 U.S.C. Sec. 815(c)(1) (Supp.1981) provides:
 
 
 9
 No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners, or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine.....
 
 
 10
 Throughout the proceedings the company took the position that it did not discharge Neal because he gave information to the inspectors, but instead that it had validly terminated him for three reasons: (1) he used equipment without consent of the supervisor or mechanic; (2) he operated the equipment in an unsafe manner by carrying a scraper bowl too high off the ground for safety; and (3) he failed to use the seat belts provided as a safety device on the equipment.[3] The ALJ disagreed, holding that under the test of Secretary of Labor on behalf of Pasula v. Consolidation Coal Co., 2 FMSHRC 2786 (1980), Neal's rights were violated, and that he was entitled to reinstatement with backpay.
 
 The Pasula test provides:
 
 11
 the complainant has established a prima facie case of a violation of Section 105(c)(1) if a preponderance of the evidence proves (1) that he engaged in a protected activity, and (2) that the adverse action was motivated in any part by the protected activity. On these issues, the complainant must bear the ultimate burden of persuasion. The employer may affirmatively defend, however, by proving by a preponderance of all the evidence that, although part of his motive was unlawful, (1) he was also motivated by the miner's unprotected activities, and (2) that he would have taken adverse action against the miner in any event for the unprotected activities alone. On these issues, the employer must bear the ultimate burden of persuasion. It is not sufficient for the employer to show that the miner deserved to have been fired for engaging in the unprotected activity; if the unprotected conduct did not originally concern the employer enough to have resulted in the same adverse action, we will not consider it. The employer must show that he did in fact consider the employee deserving of discipline for engaging in the unprotected activity alone and that he would have disciplined him in any event.
 
 
 12
 Secretary of Labor on Behalf of Pasula, 2 FMSHRC at 2799-2800 (emphasis in original).[4] W.B. Coal challenges the language of the test requiring the employer only to be improperly motivated "in any part" and objects to that part of the test which appears to shift to the employer the burden of proving a legitimate reason for the discharge.
 
 I.
 
 13
 The Pasula test is one of many attempts by courts and administrative agencies to determine whether an employer is truly motivated by an improper consideration when there are "mixed motives." This issue arises when an employer punishes employees for engaging in activities protected by the Constitution or by statute, but there also exists a legitimate business reason for his actions. The Pasula test is derived from Mount Healthy Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which considered the proper allocation of the burden of proof in mixed motive cases involving constitutionally protected speech.[5] The Court stated:Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"--or, to put it in other words, that it was a "motivating factor" in the [employer's] decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the [employer] has shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.
 
 
 14
 Id. at 287, 97 S.Ct. at 576 (footnotes omitted).
 
 
 15
 The National Labor Relations Board ("NLRB") adopted a test similar to the Mount Healthy test for unfair labor practice claims arising under the National Labor Relations Act ("NLRA") in Wright Line, a Division of Wright Line, Inc., 251 NLRB 1083 (1980). It stated:
 
 
 16
 [W]e shall henceforth employ the following causation test in all cases alleging violation of [the Act]. First, we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.
 
 
 17
 251 NLRB at 1089.
 
 
 18
 W.B. Coal claims that the "in any part" language of the Pasula test significantly weakens the Mount Healthy and Wright Line tests, which respectively require a prima facie showing that protected behavior was "a substantial or motivating factor" or "a motivating factor" in an employer's decision to discipline an employee.
 
 
 19
 As an initial matter, we find no reason to require that the language of Mount Healthy or Wright Line be followed exactly as long as the test used is consistent with the Mine Act.[6] If the Commission's interpretation of the Mine Act "is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).
 
 
 20
 The Mine Act prohibits discrimination against a miner "because" he exercised his rights under the Act. 30 U.S.C. Sec. 815(c) (Supp.1981). Our circuit allows use of an "in part" test in mixed motive cases brought under the NLRA, which also precludes employers from discriminating against employees "because" they provided information to the agency. See 29 U.S.C. Sec. 158(a)(4); NLRB v. Retail Store Emp. Union, Local 876, 570 F.2d 586 (6th Cir.1978). Before the Board's adoption of the mixed motive test of Wright Line, our court had enforced orders which used as their basis the earlier NLRB test that an employer violated the NLRA whenever his activities were motivated "at least in part" by a protected activity. See, e.g., Vic Tanny Int'l v. NLRB, 622 F.2d 237 (6th Cir.1980); NLRB v. Elias Bros. Restaurant, 496 F.2d 1165, 1167 (6th Cir.1974).[7] As we see no relevant distinction between the Mine Act and the NLRA that compels a different result here, we find the first part of the Pasula test is a "reasonably defensible" interpretation of the Mine Act.
 
 
 21
 What does give concern, however, is the language adopted from Pasula and applied here which shifts the burden of proof to the employer, a procedural technicality which nevertheless involves sufficient substance to have prompted both the First and Third Circuits to reject in part the Mount Healthy test. See Behring Int'l, Inc. v. NLRB, 675 F.2d 83 (3rd Cir.1982); NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).
 
 
 22
 As we have noted, the Pasula test is derived from Mount Healthy. While no court has yet considered whether the allocation of the burden in Pasula is appropriate, many courts have scrutinized NLRB formulation of Wright Line, 251 NLRB at 1083, which also relies on Mount Healthy.[8]
 
 
 23
 The NLRB determined in Wright Line, as did the Commission in Pasula, that upon proof of partially improper motivation the burden of proof shifts to the employer to prove a legitimate business reason for his action. In reviewing that decision, the First Circuit found that "the only burden which may be acceptably placed on the employer is a 'burden of production,' that is, a burden of coming forward with credible evidence to rebut or meet the general counsel's prima facie case." NLRB v. Wright Line, 662 F.2d at 904. It therefore declined to follow the Mount Healthy test in its original form.
 
 
 24
 Mount Healthy was a suit in federal district court pursuant to 28 U.S.C. Sec. 1331, whereas actions commencing before the NLRB, as in Wright Line, or before the Mine Safety and Health Review Commission as in the instant case, come to our court under the provisions of their respective enabling acts and of the Administrative Procedures Act ("APA"). 5 U.S.C. Secs. 501, et seq. The Third Circuit, noting this distinction, observed that "Mount Healthy is inapposite in its burden shifting phase ... because the [NLRB] is bound by statutory limitations which foreclose the issue." Behring, supra, 675 F.2d at 88.
 
 
 25
 One such limitation is found in section 10(c) of the NLRA, 29 U.S.C. Sec. 160(c), which provides:
 
 
 26
 If upon a preponderance of the testimony taken, the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.
 
 
 27
 Likewise, section 7(c) of the APA, 5 U.S.C. Sec. 556, precludes a shift in the burden of proof to an employer, providing in part:
 
 
 28
 Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof.
 
 
 29
 In Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court considered the requirements of a prima facie case under Title VII and explained thoroughly the traditional meaning of "burden of proof." The Court stated:
 
 
 30
 The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 By establishing a prima facie case, plaintiff in effect creates a presumption that the employer unlawfully discriminated against the employee. If a trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.
 
 
 34
 The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact ....
 
 
 35
 Id. at 253-55, 101 S.Ct. at 1093-1094 (emphasis added) (citations and footnotes omitted). Due to the statutory requirement that plaintiffs retain the burden of proof, the First Circuit in Wright Line and the Third Circuit in Behring found the analysis of the Supreme Court in Burdine to be a more accurate guide than the analysis of Mount Healthy.[9] Both circuits concluded that plaintiff meets his burden only by showing that the employer's action would not have occurred "but for" the protected activity. Behring, supra, 675 F.2d at 89; Wright Line, supra, 662 F.2d at 902-03.
 
 
 36
 We agree with the reasoning of the First and Third Circuits regarding the impact of section 10(c) of the NLRA and section 7(c) of the APA, and conclude that it applies with equal force to the Mine Act. Although the Mine Act has no section comparable to section 10(c) of the NLRA, it does require that administrative hearings be conducted pursuant to 5 U.S.C. Sec. 554. See 30 U.S.C. Sec. 820 (Supp.1981). Section 554 in turn incorporates section 7(c) of the APA, which, as stated above, places the burden of proof upon the claimant. Therefore the Commission is bound, as is the NLRB, by the requirement that the plaintiff bear the burden of proof. The commission erred to the extent it has relied on contrary language from its decision in Pasula.
 
 
 37
 It is true, of course, that the legislative history of section 815 of the Mine Act indicates a vital Congressional concern with the health and safety of mine workers. The act is remedial in nature and should be broadly construed. Phillips v. Interior Board of Mine Operations Appeals, 500 F.2d 772 (D.C.Cir.1974); see Marshall v. Whirlpool Corp., 593 F.2d 715, 721-22 (6th Cir.1979), aff'd, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980). The Senate Report specifically provides that the section should be "broadly interpreted by the Secretary," and explains further that "whenever protected activity is in any manner a contributing factor to the retaliatory conduct, a finding of discrimination should be made."[10] Thus the burdenshifting language in Pasula arguably is a "reasonably defensible" interpretation of the Act, in which case we must defer to the Commission.[11]
 
 
 38
 This argument is not persuasive. The Pasula test cannot be a "reasonable interpretation" of the Act because it conflicts with statutory language requiring proof of discrimination "because of" protected activities, 30 U.S.C. Sec. 815(c)(2), and language requiring the burden of proof to remain with the claimant, see 5 U.S.C. Sec. 556(c).[12] As suggested by the Third Circuit, it is unhelpful to review the legislative history when the language of the statute itself is clear. Behring, supra, 675 F.2d at 90 n. 6.
 
 
 39
 We recognize that the antidiscrimination provision in the Mine Act is designed to protect important rights of the miners. This concern, however, cannot be used to circumvent procedural requirements of the Mine Act. Similarly strong Congressional concern may be found regarding the NLRA and the Occupational Safety and Health Act; yet, Congress requires that the APA or similar provisions be used to determine whether those rights have been violated. See 29 U.S.C. Secs. 160(c), 659(c). As Burdine indicates, the important policies of Title VII are to be vindicated by use of the traditional allocation of the burden of proof to the plaintiff. We conclude that the test we adopt today does not impair the exercise of rights Congress has guaranteed under the Mine Act.
 
 
 40
 In summary, the proper test in considering mixed motives under the Mine Act is that, upon plaintiff's showing that an employer was motivated in any part by an employee's exercise of rights protected by the Act, the employer has the burden only of producing evidence of a legitimate business purpose sufficient to create a genuine issue of fact. The plaintiff, who retains the burden of persuasion at all times, may of course rebut the employer's evidence "directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff's ultimate burden is to persuade the trier of fact that he would not have been discharged "but for" the protected activity. Therefore, we must decide whether the Commission's decision here can be upheld when the proper test is applied to the facts as was the decision of the NLRB in Wright Line, or whether, as in Behring, a remand is required.
 
 II.
 
 41
 Assuming that Lynch was motivated in part by Neal's report, it is unclear whether the ALJ would nonetheless have found the discharge illegal had he imposed upon the employer only the burden of coming forward with evidence to create an issue of fact. While it is not our duty to weigh the evidence concerning the cause of Neal's discharge, a review of the record discloses that the employer produced evidence to respond to each issue raised by Neal.
 
 
 42
 For example, the ALJ found important the fact that Lynch did not immediately fire Neal. Lynch testified that he hesitated because he was not in possession of all of the evidence when the accident occurred on Friday, February 16. Lynch stated that he resumed his investigation on Monday, and after discussing the incident with Mr. Sovell, concluded that the monetary damage to the machine was substantial.
 
 
 43
 Lynch testified regarding why he had fired Neal:
 
 
 44
 In the first place I was very surprised to learn that Mr. Neal was on the scraper at all.
 
 
 45
 That was one reason.
 
 
 46
 I asked the mechanics. I asked everyone who saw him get on it why he got on it, who put him on it. No one had anything to say. No one knew.
 
 
 47
 He simply got on the machine and started off with it toward this cut.
 
 
 48
 That was another reason.
 
 
 49
 Obviously, it appeared that the bowl was very high off the ground which is a safety violation.
 
 
 50
 I believe I read somewhere this was confirmed. I can't recall now where, but in my mind it was confirmed that the bowl was, in fact, very high off the ground.
 
 
 51
 I saw Mr. Marker, and I believe Mr. Poe may have been there. They came to the office, I believe, on a Tuesday. I don't think it was on that Monday.
 
 
 52
 They started writing out the violations, and one of them said his seat belt wasn't fastened.
 
 
 53
 I said, how do you know that the seat belt wasn't fastened? It was after the fact. They said, Mr. Neal told us that the seat belt was not fastened.
 
 
 54
 That was another citation.
 
 
 55
 I took all of these actions of Mr. Neal and put them together, and it amounted in my mind to cause for his dismissal.
 
 
 56
 App. 265-68. The ALJ concluded from Lynch's final sentence that Neal's admission that his seat belt was not fastened, rather than the fact that Neal violated that rule, was the basis for his discharge. Lynch testified, however, that "it was quite mandatory that [Neal] talk to the MSHA inspectors. Certainly, that would give me no cause to discharge Mr. Neal." App. 268. It can also be observed that there was no particular need for haste in reaching a decision concerning Neal because he was hospitalized during the period in question.[13]
 
 
 57
 Additionally, Lynch offered some evidence to support a finding that he waited to make a decision regarding Neal because of his good work record. Lynch testified that he alone had the power to hire and fire; yet, he spoke to Sovell and was obviously troubled with the decision:
 
 
 58
 In this particular case Mr. Neal had not errored in the past. He had been a very good employee.
 
 
 59
 However, there were many errors here all at once.
 
 
 60
 Our policy normally would be not to terminate any employee without some past experience with a violation of some sort.
 
 
 61
 In Mr. Neal's case there were no past violations of company or safety policy.
 
 
 62
 I felt in this case there were enough errors in judgment and everything that was involved to justify termination.
 
 
 63
 I only wanted to feel in my mind that I was correct. A second opinion was what I sought.
 
 
 64
 App. 323.
 
 
 65
 There was evidence on the record supporting W.B. Coal's claim that it would have fired Neal without the added factor that he reported his seat belt violation. Sovell testified that, although unauthorized use of equipment warranted dismissal or reprimand, he knew of no other employee who had been dismissed for this reason. Haverfield similarly did not know of anyone who was fired for unauthorized use. The ALJ relied upon these facts in his opinion and made the further finding that "normally employees would not be discharged by W.B. Coal for negligent or unsafe use of equipment without a history of prior violations." There was, however, evidence that workers had been fired for negligent use of equipment. For example, Sovell testified that employee Roy Kohler was dismissed when he did not follow instructions regarding the operation of a piece of equipment. Sovell testified that a worker named Randolph was also fired for operating equipment improperly after being instructed on proper use. Lynch fired two workers when a "dragline" machine was damaged due to negligence. Five others were dismissed for failure to maintain a machine. While the ALJ found that normally discharge would come only after a history of violations, there appears to be no evidence that the two workers who damaged the "dragline" machine had been given any warnings prior to their dismissal. While it is true that no workers had been fired solely for failure to wear a seat belt, there was evidence that employees had been reprimanded for that reason. W.B. Coal asserts that this violation served only to add to the severity of Neal's other violations rather than serving as a sole basis for his discharge.
 
 
 66
 We do not suggest that Neal necessarily was discharged for unprotected reasons. There is evidence on the record which could support a finding that Neal's discharge was based, at least in part, upon his protected activity. However, it is unclear whether the ALJ would have come to a different conclusion regarding W.B. Coal's proffered reasons had he applied the proper standard, and the evidence offered may create an issue of fact. An ALJ additionally may find upon remand that Neal is able to rebut any issue of fact raised by W.B. Coal. However, the ALJ based his decision upon the test promulgated in Pasula, stating that "W.B. Coal had failed to establish its affirmative defense." Neal v. Boich, Docket No. LAKE 80-105-D, op. at 10 (emphasis added). As he based his holding upon an erroneous construction of the Mine Act, we must remand for a determination of the cause of Neal's discharge under the proper standard.
 
 
 67
 Under the circumstances we believe that a simple denial of enforcement would be inappropriate here. There is nothing in the record to suggest that the evidence cannot be reweighed and reevaluated by an ALJ with fidelity to the standard set forth in this opinion.
 
 III.
 
 68
 W.B. Coal also challenges the propriety of the backpay award, claiming that the ALJ refused to deduct from the award welfare and unemployment compensation which Neal received after his discharge.[14] While no court to our knowledge has considered this question in the context of awards under the Mine Act, it has been considered in actions brought under the NLRA and under Title VII.
 
 
 69
 Section 110 of the Mine Act provides that the Secretary may take "such affirmative action ... as the Secretary deems appropriate, including, but not limited to, reinstatement of the miner ... with back pay." 30 U.S.C. Sec. 820 (Supp.1981). This language is similar to that included in the NLRA.[15]
 
 
 70
 In refusing to reduce the award, the ALJ cited NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). In Gullett Gin Co., the Supreme Court construed the NLRA and held:
 
 
 71
 To effectuate the policies of the Act the Board has broad but not unlimited discretion.
 
 
 72
 * * *
 
 
 73
 * * *[W]e hold that the Board had the power to enter the order in this case refusing to deduct the unemployment compensation payments from back pay, and that in so doing the Board did not abuse its discretion.
 
 
 74
 Such action may reasonably be considered to effectuate the policies of the Act. To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.
 
 
 75
 But respondent argues that the benefits paid from the [unemployment fund] were not collateral but direct benefits. With this theory we are unable to agree. Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than "whole" as that phrase has been understood and applied.
 
 
 76
 NLRB v. Gullett Gin Co., 340 U.S. at 362, 364-65, 71 S.Ct. at 338, 339-340 (emphasis in original) (citations omitted). This standard has been applied in the context of the Age Discrimination Act, see Syvock v. Milwaukee Boiler Mfg. Co., Inc., 665 F.2d 149 (7th Cir.1981), and in the context of a Title VII action. EEOC v. Sandia Corp., 639 F.2d 600 (10th Cir.1980). Nonetheless, W.B. Coal urges that the rule in our circuit is to the contrary, at least with respect to unemployment payments, relying upon Satty v. Nashville Gas Co., 522 F.2d 850 (6th Cir.1975). Such reliance, however, is misplaced.
 
 
 77
 In Satty, the plaintiff prevailed in her Title VII action alleging discrimination in her company's maternity leave policy. In granting relief, the district court awarded sick leave benefits and back wages. This amount, however, was reduced by temporary wages and unemployment insurance receipts. Our court, speaking through United States District Judge Robert L. Taylor, found that the district court's relief was appropriate, citing Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir.1975), and Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir.1973). Both Meadows and Head, in accordance with Gullett, simply state that backpay awards are within the discretion of the trial judge. Accord Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir.1980) (deduction of unemployment benefits within court's discretion); EEOC v. Enterprise Ass'n Steamfitters, 542 F.2d 579 (2d Cir.1976) (deduction of sums from collateral sources within discretion).
 
 
 78
 We have found no cases in which a court has found an abuse of discretion in a trial court's refusal to deduct such payments. We therefore conclude that the rationale employed by the Supreme Court in Gullett provided an adequate basis for the decision of the ALJ here, especially since the record shows no unusual circumstances compelling a different result.[16] Upon remand, of course, the Commission remains free to exercise its discretion in considering any setoffs from a backpay award should that issue again become relevant.
 
 
 79
 Remanded to the Commission for further proceedings consistent with this opinion.
 
 
 
 *
 Hon. Robert L. Taylor, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 W.B. Coal did not contact MSHA on February 16, but did notify the Ohio Department of Natural Resources that an accident had occurred
 
 
 [2]
 The MSHA is an administration within the Department of Labor, which has the responsibility for enforcing the Mine Act, 30 U.S.C. Secs. 802, 961 (Supp.1981)
 
 
 [3]
 W.B. Coal claimed that Neal had engaged in three unprotected activities which led to his discharge. First, he violated General Safety Rule # 6, which provides: "Do not operate equipment you are not familiar with or not authorized to operate." He also violated Rule # 19, which requires that all workers "[w]ear required protective safety equipment--safety belt, gloves, hard hat, eye protection, etc." Finally, Neal violated the admonition in the Direction for Pan Operations providing: "DO NOT move pans while scraper is in high position." Neal does not dispute these three violations
 
 
 [4]
 Pasula was reversed by the Third Circuit in Consolidation Coal Co. v. Marshall, 663 F.2d 1211 (3d Cir.1981), but the court did not reach the issue of whether the test promulgated there was appropriate. The court found that the employee was dismissed not because of his exercise of a protected activity but instead because he effectively closed down his shift. This unprotected activity furnished an independent basis for his discharge
 
 
 [5]
 The district court found that Doyle's activities were protected by the First Amendment and that Doyle was entitled to be reinstated because exercise of those rights played a "substantial part" in the decision. The Supreme Court explained that the inquiry could not end at that point. It found:
 [A] rule of causation focusing only on whether protected conduct played a part ... in a decision ... could place an employee in a better position as a result of protected conduct that he would have occupied had he done nothing. The difficulty with the rule enunciated by the district court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision--even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.
 Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575-576, 50 L.Ed.2d 471 (1977).
 
 
 [6]
 It is difficult to discern a substantial difference among the various tests used. The Supreme Court interchangeably employs the tests. In Mount Healthy, the Court required the plaintiff to show that an impermissible reason was a "substantial factor" or "a motivating factor" in his discharge. Mount Healthy Bd. of Educ., 429 U.S. at 287, 97 S.Ct. at 576. It then cited Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 270-71 n. 21, 97 S.Ct. 555, 566-567 n. 21, 50 L.Ed.2d 450, which stated that "[p]roof that the decision by [defendant] was motivated in part by an originally discriminatory purpose ... would ... have shifted to [defendant] the burden ...." (emphasis added). We additionally find no significant distinction between "a motivating factor" as used in Wright Line and "motivated in any part" as used in the Pasula test
 
 
 [7]
 In Charge Card Ass'n v. NLRB, 653 F.2d 272 (6th Cir.1981), our court for the first time indicated that "the proper test for evaluating mixed-motive cases is whether punishment of a protected act ... was a dominant motive in the employer's actions." While no authority was cited for this particular standard, the First Circuit had held it to be a proper standard prior to adoption of the Wright Line test. See NLRB v. Wright Line, 662 F.2d 899, 902 (1st Cir.1981)
 The concern of the First Circuit in Wright Line was not the "in part" test itself, however. The NLRB in its Wright Line decision explained that "Mt. Healthy represents a rejection of an 'in part' test which stops with the establishment of a prima facie motive." 251 NLRB at 1087 (emphasis added). It thus added the second part of its test to allow the employer to establish a legitimate reason for his actions. The First Circuit viewed the NLRB's Wright Line test as inadequate not because of its initial "in part" language, but because in a mixed motive case the test did not aid in determining whether the discrimination would not have occurred "but for" the protected activity. Wright Line, 662 F.2d at 902-03. Because this question will not arise until the employer alleges a second cause, the issues which earlier prompted the First Circuit to adopt a "dominant motive" test are more properly considered with reference to the second prong of the Pasula test. See discussion infra, pp. 280-282.
 
 
 [8]
 The circuits disagree about the burden shifting portion of the test in Wright Line. Compare Behring Int'l Inc. v. NLRB, 675 F.2d 83 (3rd Cir.1982) (test improper), and NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981) (test improper), with Zurn Industries, Inc. v. NLRB, 680 F.2d 683 (9th Cir.1982) (test proper), and NLRB v. Fixtures Mfg., 669 F.2d 547 (8th Cir.1982) (test proper). See generally Note, Dual Motive Discharge, 58 Notre Dame L.Rev. 118 (1982)
 Although the Sixth Circuit has not yet considered whether the burden shifting portion of Wright Line is proper, it has cited that case with approval in several cases. See, e.g., Republic Die & Tool Co. v. NLRB, 680 F.2d 463 (6th Cir.1982); Borel Rest. Corp. v. NLRB, 676 F.2d 190 (6th Cir.1982); NLRB v. Lloyd A. Fry Roofing Co., 651 F.2d 442 (6th Cir.1981).
 In some cases, however, it is unclear whether the Wright Line test has been viewed as appropriate. In Charge Card, the court decided that the proper test was "dominant motive," but it noted the Board's decision in Wright Line and stated that "under either ... test ... we conclude there is not substantial evidence to support the decision that employees were fired for engaging in protected activities." Both tests were also cited in NLRB v. Consolidated Freightways, 651 F.2d 436 (6th Cir.1981). The only Sixth Circuit case not considering the Wright Line test is NLRB v. Pyromatics, 677 F.2d 24 (6th Cir.1982). In Pyromatics, however, it was found that protected activity was a dominant motive, so there was no reason to consider the test. The court found substantial evidence to support the Board's conclusion that an employer violated the NLRA under either test in NLRB v. ComGeneral, 684 F.2d 367 (6th Cir.1982).
 
 
 [9]
 The First Circuit carefully described the difference between allocating the burden of proof to defendant and merely requiring defendant to rebut a presumption of discrimination raised in plaintiff's prima facie case:
 Professor Wigmore distinguishes between the burden of rebutting a prima facie case and the burden of persuading the trier of fact on the ultimate issue in a case by a preponderance of the evidence as follows:
 "[A] 'prima facie' case ... need not be overcome by a preponderance of the evidence of greater weight; but the evidence needs only to be balanced, put in equipoise, by some evidence worthy of credence; and, if this be done, the burden of the evidence is met and the duty of producing further evidence shifts back to the party having the burden of proof ...."
 
 
 [9]
 Wigmore on Evidence Sec. 2487, at 282 (3d ed. 1940), quoting Speas v. Merchants' Bank & Trust Co., 188 N.C. 524, 125 S.E. 398 (1924)
 * * *
 The imposition of this limited burden, however, does not shift to the employer the burden of proving that [a violation of the Act] has not occurred. Rule 301 of the Federal Rules of Evidence very aptly describes the scope of the duty involved in rebutting presumptions in civil cases as "the burden of going forward with evidence to rebut or meet the presumption," and distinguishes this duty from "the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301. Thus, the employer ... has no more than the limited duty of producing evidence to balance, not to outweigh, the evidence produced by the general counsel.
 NLRB v. Wright Line, 662 F.2d at 905.
 
 
 [10]
 S.Rep. No. 95-181, 95th Cong. 2d Sess. 1977, U.S.Code Cong. & Admin.News 1977, p. 3401, reprinted in the Legislative History of the Federal Mine Safety and Health Act of 1977 at 623-24
 The House adopted the broader language included in the Senate Report. The Conference Report provides:
 The Senate bill prohibited discrimination against miners, their representatives, or applicants for employment because of their activities under the Act. The House amendment adopting Section 110(b) of the Coal Act protected only miners and their authorized representatives (the Senate bill did not use the term "authorized"). The House amendment did not afford this protection to job applicants.
 The Senate bill defined a broad range of "protected activities" to wit: Making or filing a complaint including a complaint of a suspected violation of imminent danger; being subject to medical evaluation and potential transfer under a standard; instituting or causing to be instituted any proceeding under the Act; testifying in any such proceeding; or exercising any statutory right under the Act. The House amendment specified as protected activities; notifying the Secretary of any alleged violation; instituting or causing to be instituted any proceeding under the Act or testifying in any such proceeding.
 U.S.Code Cong. & Admin.News 1977, p. 3499. The conference substitute conforms to the Senate bill. Jnt. Explanatory Stmt. of the Comm. of Conf., 95th Cong.2d Sess. 1977, reprinted in the Legislative History of the Federal Mine Safety and Health Act of 1977 at 1329.
 
 
 [11]
 Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); cf. Zurn Industries, Inc. v. NLRB, 680 F.2d 683 (9th Cir.1982) (Wright Line test within authority of the NLRB to adopt as it merely provides "formal framework" for establishing legitimate business reason); NLRB v. Fixtures Mfg., 669 F.2d 547, 550 (8th Cir.1982) (Wright Line burden-shifting within latitude Board should have in difficult cases)
 
 
 [12]
 The Third Circuit explained why a test shifting the burden of proof to the employer is inconsistent with a requirement that the employer discriminated "because of" protected activity:
 [Under the Board's Wright Line test ] General Counsel need not prove that antiunion discrimination was the "real cause" of the employee's discharge. Instead, the Wright Line procedure only requires the General Counsel to show that antiunion animus was "a" motivating factor in the employer's decision. If the employer then proffers a legitimate reason for its action, but does not do so with enough weight to carry the burden of persuasion, the Board would rule that the ... charge had been proved. This would be so despite the fact that two factors--neither outweighing the other--had been advanced as causes, and the Board never determined which was the real one. As such, the procedural aspect of the rule is plainly at odds with a "but for" test.
 Behring, supra, 675 F.2d at 88.
 
 
 [13]
 Lynch also testified that he attempted to reach Neal before learning of the seat belt violation, but he stated he was unable to do so due to a labor strike at a nearby hospital which increased the burdens upon the hospital where Neal stayed. Neal challenged Lynch's assertion that the hospital would not place calls to patients or allow visitors
 
 
 [14]
 The ALJ deducted Neal's salary earned at another job; this deduction is not at issue. The unemployment compensation at issue was not collected by Neal following his employment at W.B. Coal, but instead was received as a result of his layoff from subsequent employment elsewhere
 W.B. Coal also urges that the amount of backpay award should be reduced insofar as it reflects increased monetary liability because of a delay in MSHA's investigation. That issue was not raised before the Commission, and we decline to entertain it now. Section 113(d)(2)(A)(iii) of the Act provides: "[e]xcept for good cause shown, no assignment of error ... shall rely upon any question of fact or law which the administrative law judge had not been afforded any opportunity to pass." 30 U.S.C. Sec. 823(d)(2)(A)(iii). Section 106(a) provides: "[n]o objection that has not been urged before the Commission shall be considered by the Court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 30 U.S.C. Sec. 816(a).
 
 
 [15]
 Section 10 of the NLRA, 29 U.S.C. Sec. 160, provides:
 The Board may take affirmative action, including reinstatement ... with ... backpay, as will effectuate the policies of the Act.
 The NLRA model for backpay awards has been adopted in Title VII cases. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 422, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).
 
 
 [16]
 For a thorough discussion of this issue see EEOC v. Sandia Corp., 639 F.2d 600, 624-26 (10th Cir.1980)