716 F.2d 1105
 1983 O.S.H.D. (CCH) P 26,658
 SOUTHERN OHIO COAL COMPANY, Petitioner,
v.
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, Respondent,
Raymond J. Donovan, Secretary, United States Department of
Labor, Local Union No. 1957, United Mine Workers
of America, et al., Intervening Respondents.
 No. 81-3007.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 19, 1982.
Decided Sept. 12, 1983.
 
 D. Michael Miller (argued), Alvin J. McKenna, Alexander, Ebinger, Fisher, McAlister & Lawrence, Columbus, Ohio, for petitioner.
 Federal Mine Safety & Health Review Com'n, Anthony J. Steinmeyer, Al J. Daniel, Jr., Civ. Div., Dept. of Justice, Washington, D.C., for respondent.
 Leslie J. Canfield (argued), U.S. Dept. of Labor, Arlington, Va., for intervening respondent Secretary of Labor.
 William T. Fahey, Frank Cuomo, Jr., Barnes, Watson, Cuomo, Hinerman & Fahey, Weirton, W.Va., for intervening respondents Local Union 1957, David Biggs, Don Albert Hunter, Thurmond Adkins, Chester Young, Maynard Champe Ruler and Curtis Chaney.
 Before ENGEL and KENNEDY, Circuit Judges, and ENSLEN, District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 The Southern Ohio Coal Company ("SOCCO") petitions for review of an order of the Federal Mine Safety and Health Review Commission ("the Commission") determining that SOCCO violated section 110 of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. Sec. 820(b) (1976) (amended 30 U.S.C. Sec. 815(c) (Supp. IV 1980)) ("the 1969 Act")[1] when it refused to pay several miners for the remainder of their shift or to provide them with alternative work when the miners refused to work in a section of a mine they believed was unsafe.
 
 
 2
 The miners worked a 12:00 midnight to 8:00 a.m. shift at SOCCO's Racoon No. 3 underground mine. On March 15, 1977, the crew entered the mine on a "mantrip" trolley and encountered a pool of water approximately six inches deep. Although the crew crossed the water to work their shift and later to leave the mine, they advised their foreman, Tom Bozicevic, that something should be done about the water. The crew again encountered a body of water, which was deeper than the night before, when they began their shift on March 16, 1977. They informed Bozicevic that they would not cross the water to work the following night. Bozicevic then called the shift foreman, Doug Ellison, and advised him that water should be pumped from the area.
 
 
 3
 The miners encountered the water again on March 17, 1977, which at that time was 12 to 16 inches deep. The miners refused to cross the water. Bozicevic called Ellison, who told the miners that they could enter the mine through alternate routes. The miners refused on the ground that the alternate routes were also unsafe, and they asked Bozicevic to see a safety committeeman and a mine inspector. They then rode the mantrip to the surface of the mine, where they were met by James Trout, the safety committeeman, and Ellison. The miners asked Ellison for alternate work, and he again indicated there were alternate ways to enter the mine. The miners again responded that the alternate routes were not safe. Ellison stated that three of the crew members were needed to set up the pump needed to expel the water. When only two immediately responded, Ellison informed the miners that only two workers were needed. Ellison did not offer alternative work to the remaining miners.
 
 
 4
 Trout inspected the mine and found the water to be 60 feet long, 24 feet wide, and 12 to 16 inches deep. The miners filed a grievance based on the failure of SOCCO to offer them alternative work pursuant to a provision in the collective bargaining agreement which specified that they receive such work if there is a good faith dispute about mine safety, or to pay them for the March 17 shift. They also asked for a federal inspection pursuant to 30 U.S.C. Sec. 813(g) (1976) (amended 30 U.S.C. Sec. 813(g) (Supp. IV 1980)). The condition had abated when the inspector arrived, and the grievance was later dropped.
 
 
 5
 The miners filed suit claiming they were discriminated against in violation of section 110 of the 1969 Act, which provides:
 
 
 6
 (b)(1) No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, ...
 
 
 7
 30 U.S.C. Sec. 820(b)(1) (1971). The Administrative Law Judge ("ALJ") found that the miners acted reasonably and in good faith in refusing to cross the water or to take alternative routes to their working place because of unsafe working conditions. The ALJ also made the legal conclusion that the miners' request to speak to and their actual conversation with Trout on March 17, 1977 were protected activities under section 110(b) of the 1969 Act.
 
 
 8
 The ALJ nonetheless denied relief to the plaintiffs. The ALJ relied upon the test of the Commission as set forth in Munsey v. Morton, 507 F.2d 1202 (D.C.Cir.1974), which provides that the complaining miner must prove: (1) that he has reported to the Secretary or an authorized representative of the Secretary an alleged violation or danger in a coal mine; (2) that after such reporting occurred such miner was "discharged or otherwise discriminated against" in his employment; and (3) that such discharge was motivated by reason of such reporting and not for some other reason.
 
 
 9
 The ALJ found that the notice requirement was met when the employees notified their foreman of their concern about the presence of water on the mine floor. He relied upon the opinion of Judge Wilkey in Phillips v. Interior Board of Mine Operations Appeals, 500 F.2d 772 (D.C.Cir.1972), which held that the requirement of notice to the Secretary in section 110(b) of the Act was to be broadly construed to cover notice to a foreman. He did not find, however, that Ellison's refusal to assign alternate work was motivated by any intent to retaliate because the workers had given notice or complained concerning alleged unsafe conditions in the mine. He found instead that Ellison did not give the miners alternate work because he believed they did not have a contractual right to refuse to cross the water. The ALJ could find no other evidence that could be used to establish retaliation for the filing of the safety complaints. He stated:
 
 
 10
 Ellison's refusal to pay Applicants was part of step 1 of the grievance procedure the filing of which according to Ellison was "just a routine thing" if the men wanted to be paid. Still, Ellison's testimony that he refused to pay the men because they had refused to work on the pump was not persuasive since this was work for only three men.
 
 
 11
 However, other than the suspicion arising from this unconvincing aspect of Ellison's testimony, there is no evidence of discriminatory motivation in the record. In the absence of such evidence I am unable to conclude that the reasons he stated for not assigning alternative work or paying Applicants were pretexts. Respondent's position that Applicants should have crossed the body of water or taken the alternate routes is as well supported in the record as Applicants' contention that travelling these routes was unsafe. See Finding 14(e).
 
 
 12
 It is recognized that the establishment of discriminatory motivation is difficult and seldom accomplished through direct proof. However, after studying the record, I am unable to discern any substantial evidence thereof, direct or indirect. Significantly, Applicant's brief does not point to such proof. For example, evidence of a company policy, formal or otherwise, to retaliate against miners for making safety complaints was not introduced. Nor is there evidence of Respondent's taking adverse action against safety complainants in other matters which might indicate a general pattern of discriminatory conduct. A history of management hostility to safety complaints was not established. The record is devoid of admissions by Respondent's management personnel indicating an anti-safety reporting animus. Nor are there writings, accounts of conversations, or oral statements made by Respondent's officers from which the existence of a discriminatory animus can be inferred. No showing was made that Applicants received different or disparate treatment from other miners in analogous situations. Finally, there is no evidence of resentment or antagonism by Ellison or other officials traceable to Applicants' request for their safety committeeman or to their safety complaints.
 
 
 13
 In short, there is no probative evidence upon which it can be concluded that Respondent's motivation, solely or in part, was to retaliate against Applicants for engaging in activities protected by the Act. The application is found to be without merit.
 
 
 14
 Local Union No. 1957, UMW, David Biggs, et al., Docket No. VINC 77-112, op. at 15 (June 9, 1978) (references to transcript omitted).
 
 
 15
 The ALJ also found that he had jurisdiction over the claim asserted notwithstanding SOCCO's claim that the issues were arbitrable under their collective bargaining agreement.
 
 
 16
 The Commission reversed the ALJ's decision. Although it did not question the ALJ's factual findings, the Commission found a section 110 violation. It stated that the ALJ's decision was based on his belief that:
 
 
 17
 whether such actions were discriminatory depends on whether Respondent was motivated by a desire to retaliate against applicants for their reporting of safety complaints ....
 
 
 18
 Local Union 1957, United Mine Workers of America, David Biggs, et al. v. Southern Ohio Coal Company, No. VINC 77-112, mem. op. at 1 n. 4 (December 9, 1980) (emphasis in original). The Commission held:
 
 
 19
 The foreman's testimony is clear that the reason he denied the miners alternate work was because they refused to cross the water to perform their regular jobs. The judge found that this refusal by the miners was reasonable and in good faith. The Union argues that the miners' actions in these circumstances were protected under section 110. We agree. Alternate work was available, was requested, and was denied because the miners refused to work in conditions they believed were unsafe. The miners' action[s] were protected by section 110 and the foreman's refusal to afford them alternate work violated that section.
 
 
 20
 Id. at 2. This appeal followed.
 
 
 21
 SOCCO alleges on appeal that the ALJ's findings were supported by substantial evidence and that the Commission's findings therefore were not so supported. In fact, the Commission did not challenge the ALJ's finding that the workers were not denied work because of their reporting of safety complaints. It instead came to a different legal conclusion: that refusal to work under conditions which a miner in good faith believes are hazardous is independently protected by section 110(b)(1) of the 1969 Act.
 
 
 22
 We do not agree. The decision in this controversy is governed by the Act as it existed before the 1977 amendments. See note 1, supra. We are not dealing with the more liberalized provisions of the 1977 Act, which protect miners against discrimination "because of the exercise by such miner on behalf of himself or others of any statutory right afforded by this Act...." 30 U.S.C. Sec. 815(c)(1) (Supp. IV 1980). Our inquiry instead is limited solely to a consideration of section 110(b)(1) of the 1969 Act, which prohibits discrimination where "such miner ... has notified the Secretary ... of any alleged violation or danger." 30 U.S.C. Sec. 820(b)(1) (1971). The section does not, therefore, provide protection to a miner who walks off the job. Likewise, the legislative history, while clearly expressing an intent that the Act be liberally construed, nowhere indicates that the provisions were directed to anything more than protecting against retaliation for the filing of complaints, a provision which is frequently found in similar legislation.[2] Thus, although it is clear that the section is an important part of enforcement of the Act, there is no express indication that Congress intended it to be read to protect anything more than the actual reporting of safety complaints.[3]
 
 
 23
 Accordingly, the decision of the Federal Mine Safety and Health Review Commission is REVERSED.
 
 
 
 *
 The Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The 1969 Act was amended by the Federal Mine Safety and Health Act of 1977, 30 U.S.C. Sec. 801 et seq. (Supp. IV 1980) ("the 1977 Act"). The 1977 Act was passed on November 9, 1977 and therefore has no application to the present suit
 
 
 [2]
 Remarks by Senator Kennedy, who introduced the section, are the only history regarding section 110. The Senator stated:
 Mr. President, this is, I believe a noncontroversial matter. My proposed amendment would make it unlawful for any person to discharge or otherwise discriminate against a miner for bringing suspected violations of this act to the attention of authorities. In essence, the amendment gives to miners the same protection against retaliation which we give employees under other Federal labor laws. As a result, miners will feel free to point out health and safety hazards which this act is designed to prevent and correct.
 * * *
 Mr. President, the rationale for this amendment is clear. For safety's sake, we want to encourage the reporting of suspected violations of health and safety regulations. Section 301(h) of the bill, on page 85, confirms this concern by calling for immediate inspection whenever a representative of miners believes that there may be a violation of health or safety standards.
 But miners will not speak up if they fear retaliation. This amendment should deter such retaliation, and, therefore, encourage miners to bring dangers and suspected violations to public attention.
 The provisions of this amendment are similar to protections in other labor laws.
 
 
 [115]
 Cong.Rec., S27947-51 (daily ed. Sept. 30, 1969) (Statement of Sen. Kennedy), reprinted in The Legislative History of the Federal Coal Mine Health & Safety Act of 1969 at 666-68
 
 
 [3]
 The Commission's decision could be affirmed if a finding of intent is unnecessary under the 1969 Act. With respect to intent, the language of the 1969 Act is similar to that in the 1977 amendments. Compare the 1969 Act, 30 U.S.C. Sec. 820(b)(1) (1976) amended 30 U.S.C. Sec. 815(c)(1) (Supp. IV 1980) ("No person shall ... discriminate against ... any miner ... by reason of the fact that such miner ... has notified the Secretary ...."), with the 1977 Amendment, 30 U.S.C. Sec. 815(c)(1) (Supp. IV 1980) ("No person shall ... discriminate against ... any miner ... because such miner ... has filed or made a complaint.") (emphasis added) Considering the burden of proof in "mixed motive" cases, our court evaluated the liberalized 1977 Act in Boich v. Federal Mine Safety and Health Review Comm'n, 704 F.2d 275 (6th Cir.1983), and found it required plaintiff to show that he would not have been discharged "but for" the protected activity. There is therefore no reason to believe that the nearly identical operative language in the 1969 Act should not be similarly construed and, of course, here the ALJ's factual finding that there was no motive to discriminate because the miners reported the incident remains unchallenged by the Commission