822 F.2d 1134
 262 U.S.App.D.C. 72, 1987 O.S.H.D. (CCH) P 27,976
 William E. BROCK, Secretary of Labor on Behalf of Thomas L.
WILLIAMS, Petitioner,
v.
PEABODY COAL COMPANY and Federal Mine Safety and Health
Review Commission, Respondents.
Chapman MERRELL, Petitioner,
v.
PEABODY COAL COMPANY and Federal Mine Safety and Health
Review Commission, Respondents.
UNITED MINE WORKERS OF AMERICA on Behalf of James ROWE, et
al., Petitioners,
v.
PEABODY COAL COMPANY, et al., Respondents.
William E. BROCK, Secretary of Labor, on Behalf of I.B.
ACTON et al., Petitioners,
v.
JIM WALTER RESOURCES, INC., and Federal Mine Safety and
Health Review Commission, Respondents.
UNITED MINE WORKERS OF AMERICA, Petitioner,
v.
JIM WALTER RESOURCES, INC., and Federal Mine Safety and
Health Review Commission, Respondents.
 Nos. 85-1714, 85-1716, 85-1717, 86-1002 and 86-1027.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 20, 1987.
Decided July 7, 1987.
 
 Petitions For Review of Orders of the Federal Mine Safety and Health Review Commission.
 David M. Smith, with whom Fournier J. Gale III, Birmingham, Ala., was on the brief for respondent, Jim Walter Resources, Inc., in Nos. 86-1002 and 86-1027.
 Thomas C. Means, with whom Timothy M. Biddle, Edward M. Green, Henry Chajet and Michael F. Duffy, Washington, D.C., were on the brief for amicus curiae, American Min. Congress, et al.
 L. Joseph Ferrara, Washington, D.C., entered an appearance for Federal Mine Safety and Health Review Com'n.
 Linda L. Leasure, Atty., Dept. of Labor, with whom Cynthia L. Attwood, Associate Sol., and Ann Rosenthal, Counsel, Appellate Litigation, Dept. of Labor, Arlington, Va., were on the brief for petitioner, William E. Brock, Secretary of Labor, in Nos. 85-1714 and 86-1002.
 Mary Lu Jordan, with whom Michael H. Holland, Washington, D.C., was on the brief for petitioner, United Mine Workers of America, et al., in Nos. 85-1716, and 85-1717 and 86-1027.
 Michael O. McKown, with whom Michael A. Kafoury, St. Louis, Mo., was on the brief for respondent, Peabody Coal Co., in Nos. 85-1714, 85-1716 and 85-1717.
 Before RUTH BADER GINSBURG, BUCKLEY and D.H. GINSBURG, Circuit judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 The Secretary of Labor (Secretary) seeks review of two orders of the Federal Mine Safety and Health Review Commission (Commission). See Secretary of Labor ex rel. Acton and UMWA v. Jim Walter Resources, 7 FMSHRC 1348 (September 1985); United Mine Workers of America ex rel. Rowe v. Peabody Coal Co., 7 FMSHRC 1357 (September 1985). In these orders, consolidated for appeal, the Commission found that two coal mine operators, Peabody Coal Co. (Peabody) and Jim Walter Resources, Inc. (Jim Walter), did not violate the Federal Mine Safety and Health Act of 1977 (Act) by the way in which they recalled laid-off miners. Specifically, the operators passed over some miners at the top of the recall list because they had not received the current generic safety training required by Mine Safety and Health Administration (MSHA)[1] regulations before they could resume work.[2] The Secretary argued to the Commission that this rehiring policy constituted unlawful discrimination under section 105(c)(1) of the Act. The Commission disagreed, and we affirm its disposition, holding that the Secretary has not reasonably interpreted the Act.[3]
 
 I. STATUTORY AND REGULATORY FRAMEWORK
 
 2
 The Federal Mine Safety and Health Act of 1977, codified at 30 U.S. Sec. 801 et seq. (1982), is comprised of the Federal Coal Mine Health and Safety Act of 1969,[4] as amended by the Federal Mine Safety and Health Amendments Act of 1977.[5] Section 115 of the Act[6] requires mine operators to establish a health and safety training program for every "miner," which term is defined in section 3(g)[7] as "any individual working in a coal or other mine." Under section 115(a), "new miners having no underground mining experience shall receive no less than 40 hours of training if they are to work underground," and "new miners having no surface mining experience shall receive no less than 24 hours of training if they are to work on the surface."[8] Furthermore, "all miners shall receive no less than eight hours of refresher training no less frequently than once each 12 months."[9] In addition, section 115(b) provides:
 
 
 3
 Any health and safety training provided under subsection (a) ... shall be provided during normal working hours. Miners shall be paid at their normal rate of compensation while they take such training, and new miners shall be paid at their starting wage rate when they take the new miner training. If such training shall be given at a location other than the normal place of work, miners shall also be compensated for the additional costs they may incur in attending such training sessions.[10]
 
 
 4
 If, during an inspection or investigation, the Secretary finds that any miner "has not received the requisite safety training as determined under section 115 of this Act," then the miner shall be withdrawn from the mine until he or she does receive it.[11]
 
 
 5
 The Secretary has issued regulations outlining these training requirements,[12] which an operator's safety training program must satisfy in order to receive MSHA approval.[13] In outlining the minimum courses of instruction, the regulations distinguish first between an "underground miner," who is "any person working in an underground mine and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards,"[14] and a "surface miner," who is "any person working in a surface mine or surface areas of an underground mine and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards."[15]
 
 
 6
 Within the classes of underground and surface miners, the regulations also distinguish between an "experienced miner" and a "new miner." An "experienced miner" is defined, with respect to underground training, as
 
 
 7
 a person who is employed as an underground miner ... on the effective date of these rules; or a person who has received training acceptable to MSHA from an appropriate State agency within the preceding 12 months; or a person who has had at least 12 months experience working in an underground mine during the preceding 3 years; or a person who had received the training for a new miner within the preceding 12 months ...[16]
 
 
 8
 The definition of "experienced miner" for surface training is essentially identical.[17] A "new miner" is defined for both underground and surface mining simply as "a miner who is not an experienced miner."[18]
 
 
 9
 The regulations then describe the requisite training for each type of miner.[19] For underground miners, the rules are as follows. A new miner may not assume his or her duties until receiving 40 hours of training, "approximately 8 hours [of which] shall be given at the minesite."[20] Thereafter, "each miner shall receive a minimum of 8 hours of annual refresher training."[21] A "newly employed experienced miner" must also receive training,[22] but it is apparently designed primarily to acquaint the miner with the unfamiliar minesite, since an "experienced miner," as defined, already has obtained the generalized "new miner" instruction required by the regulations. In a similar vein, underground miners must also receive training when assigned new tasks.[23]
 
 
 10
 The regulations establish a similar scheme for training surface miners. New surface miners must receive at least 24 hours of training, but unlike the regulations governing underground training, only 8 hours of a new surface miner's training are required to be given before the miner starts work.[24] Again, experienced miners must receive an annual 8 hour refresher course[25]; newly employed experienced miners must receive minesite-specific training[26]; and miners must receive training when assigned new tasks.[27]
 
 
 11
 The regulations also address the questions of who may provide the requisite training and how miners are to be compensated during the training. Concerning the former, the regulations state, as to both underground and surface training, that
 
 
 12
 (a) An operator of a mine may conduct his own training programs, or may participate in training programs conducted by MSHA, or may participate in MSHA approved training programs conducted by State or other Federal agencies, or associations of mine operators, miners' representatives, other mine operators, private associations, or educational institutions.
 
 
 13
 (b) Each program and course of instruction shall be given by instructors who have been approved by MSHA to instruct in the courses which are given, and such courses and the training programs shall be adapted to the mining operations and practices existing at the mine and shall be approved by [MSHA's] District Manager for the area in which the mine is located.[28]
 
 
 14
 As for compensation, the regulations provide, again with respect to both underground and surface training, that
 
 
 15
 (a) Training shall be conducted during normal working hours; miners attending such training shall receive the rate of pay as provided in [the regulation defining "normal working hours"].
 
 
 16
 (b) If such training shall be given at a location other than the normal place of work, miners shall be compensated for the additional cost, such as mileage, meals, and lodging, they may incur in attending such training sessions.[29]
 
 
 17
 The Secretary argues that the operators' recall policy of passing over miners who did not have the current safety training required by these regulations constituted "discrimination" within the condemnation of section 105(c)(1) of the Act, which provides that:
 
 
 18
 No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because [he or she] has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because [he or she] is the subject of medical evaluation and potential transfer under a standard published pursuant to section 101 or because [he or she] has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of [his or her] exercise ... of any statutory right afforded by this chapter.[30]
 
 
 19
 No MSHA regulations supplement this prohibition of discrimination.
 
 II. THE OPERATORS' POLICY
 
 20
 The two operators in this case, Peabody and Jim Walter, are parties, along with the United Mine Workers of America (UMWA), to the National Bituminous Coal Wage Agreement of 1981 (Agreement). Article XVII(d) of the Agreement provides that
 
 
 21
 Employees who are idle because of a reduction in the working force shall be placed on a panel from which they shall be returned to employment on the basis of seniority as outlined in section (a).
 
 
 22
 Article XVII(a) of the Agreement defines "seniority" as "length of service and the ability to step into and perform the work of the job at the time the job is awarded."
 
 
 23
 During the summer of 1981, Peabody notified individuals on layoff from mines in its Eastern Division[31] that they were responsible for keeping their MSHA training certification up-to-date.[32] Jim Walter instituted a similar policy. As a result Peabody and Jim Walter passed over a number of individuals who had reached the top of the recall list but lacked the necessary training or work experience to qualify under the MSHA regulations as "experienced miners" and therefore could not begin working without first receiving "new miner" training (which would entail a delay of 40 work hours for underground miners and 8 work hours for surface miners).[33] Each operator believed that its conduct in bypassing these "new miners" complied with Article XVII of the Agreement because, due to MSHA's training requirements, only "newly employed experienced miners" were qualified to "step into and perform the work of the job at the time the job [was] awarded." (Emphasis added.)
 
 
 24
 In order to avoid being bypassed when they reached the top of the recall list for jobs in which they did not qualify as "experienced miners," laid-off individuals would have to obtain "new miner" training, on their own, from an educational or state institution that had been approved by MSHA to provide such training. Peabody, but not Jim Walter, compensated recalled employees for the training costs they incurred. Having required that laid-off individuals obtain this training before being recalled, the operators ensured that they would need to provide only the minesite-specific training required by the regulations.
 
 III. THE SECRETARY'S COMPLAINT
 
 25
 In 1983 and 1984, the Secretary initiated the current litigation by filing complaints against Peabody and Jim Walter before the Commission. The Secretary contended that each operator's recall policy, by taking into account the laid-off individuals' training status, was discriminatory under section 105(c)(1) of the Act, and that Jim Walter's practice of not compensating miners who obtained pre-hire training while on layoff violated an operator's duty to train under section 115 of the Act. The Secretary sought orders requiring Peabody and Jim Walter to recall, and to provide back-pay to, the passed over employees. The Secretary also requested an order requiring Jim Walter to compensate recalled employees for "new miner" training. The Commission denied the Secretary's request that both operators be ordered to recall those who were passed over, but it did order Jim Walter to provide compensation to those who obtained training while on layoff and were recalled as a result. Jim Walter did not appeal. Thus, the Secretary's appeal of the recall issue is the only matter before us.
 
 
 26
 The Secretary argued below that sections 105 and 115 of the Act operate in conjunction to prohibit operators from considering training status when making hiring decisions; i.e., that such decisions, including recall decisions, must be "training neutral."[34] The pivotal provision is section 105(c)(1), which in relevant part prohibits discrimination "because of the exercise by such miner ... or applicant for employment ... of any statutory right afforded by this chapter."[35] Since section 105(c)(1) protects "applicants for employment," the Secretary's burden is only to show that Peabody or Jim Walter failed to recall the individuals "because of [their] exercise ... of [a] statutory right afforded by [the Act]." Accordingly, the Secretary has argued from the undisputed right afforded a "miner" under section 115 to receive training prior to beginning surface or underground work to the proposition that laid-off individuals are entitled to "training neutral" criteria for recall.
 
 
 27
 As the Commission below and the parties before us recognize, the success of the Secretary's argument depends almost entirely on whether the individuals passed over qualified as "miners" under section 115 while on layoff. The Act defines "miner" in section 3(g) as "any individual working in a coal or other mine."[36] The Commission held that individuals on layoff do not qualify as "miners." In arguing that it is reasonable to conclude otherwise, the Secretary offers an intricate explanation for why these individuals were "working in a coal ... mine," despite the obvious fact that, at the moment when the operators decided not to recall them, they were not "working in a coal ... mine" but were instead on layoff. That explanation, which was first announced only at oral argument before this court, does not represent the Secretary's first attempt at construing the term "miner" in such a way as to trigger the anti-discrimination provision in section 105(c)(1). In fact, the Secretary's current explanation for why these individuals were "miners" can only be understood in light of his failure in advocating alternative interpretations of the term "miner" before the Commission and another court of appeals.
 
 IV. THE CASE LAW
 
 28
 The Secretary's first occasion to apply sections 105(c)(1) and 115 to the hiring context arose in January 1980, when Emery Mining Corporation (Emery) adopted a policy of not hiring individuals who had never worked before in a mine unless they obtained "new miner" training on their own. Like Jim Walter, Emery did not compensate for pre-hire training. In September 1980, the Secretary filed a complaint against Emery before the Commission, arguing that Emery's compensation policy constituted unlawful discrimination under section 105(c)(1).[37]
 
 
 29
 The Administrative Law Judge (ALJ) hearing the case agreed with the Secretary, finding that the operators' pre-hire training requirement was discriminatory under that provision, and that therefore Emery could not refuse to compensate new hires for their pre-hire training costs and time. Secretary of Labor ex rel. Bennett v. Emery Mining Corp., 3 FMSHRC 2648 (November 1981) (ALJ), aff'd, 5 FMSHRC 1391 (August 1983), rev'd sub nom. Emery Mining Corp. v. Secretary of Labor, 783 F.2d 155 (10th Cir.1986).
 
 
 30
 The ALJ's holding in Emery was appealed to the Commission, but nearly two years passed before its decision issued. In the interim, another ALJ decided the legality of an earlier recall by Peabody of laid-off individuals covered by the same Agreement as is involved in this case. United Mine Workers of America ex rel. Shepard v. Peabody Coal Co., 4 FMSHRC 1338 (July 1982) (ALJ). In Shepard, Peabody had recalled individuals for underground work and, as in the instant case, it passed over an individual at the top of the recall list because, although his training status was that of an "experienced underground miner," his most recent work experience had been as a "surface miner"; he had therefore to receive training as a "newly employed experienced miner" before he could start to work. Rather than provide that training, Peabody recalled another laid-off employee, lower on the list, who presumably did not require even the minimal training required for "newly employed experienced miners."
 
 
 31
 In Shepard, the Secretary sought an order compelling the operator to hire the passed over individual, arguing that Peabody's policy constituted unlawful discrimination under the Act. The Shepard ALJ rejected the Secretary's argument, however. Although he agreed with the ALJ's opinion in Emery that the operator's policy with respect to new hires was discriminatory under the Act, he distinguished the case before him, stating that "[i]f two miners apply for a position in an underground mine, one of whom requires training and the other of whom does not, the operator does not violate the Act if he hires the latter." Id. at 1341. The Secretary did not appeal to the Commission.
 
 
 32
 On August 8, 1983, the Commission issued its decision in Emery, affirming the ALJ's order requiring training compensation. Secretary of Labor ex rel. Bennett v. Emery Mining Corp., 5 FMSHRC 1391 (August 1983), rev'd sub nom. Emery Mining Corp. v. Secretary of Labor, 783 F.2d 155 (10th Cir.1986). The Commission disagreed, however, with the ALJ's conclusion that the pre-hire training requirement in itself violated section 105(c)(1) of the Act. According to the Commission, Emery could lawfully impose such a requirement because, prior to being hired, the job applicants were not "miners" who were entitled to job training under section 115(a) of the Act. The Commission nevertheless agreed with the ALJ that section 115(b) requires operators to compensate for the training of applicants it later hires. Its reasoning was as follows. The new hires, "once hired, ... became new miners under the Act entitled to the rights granted by section 115(a) and (b)." Id. at 1395 (emphasis added). One of the rights afforded "miners," explained the Commission, was to receive MSHA training at no cost to themselves; the Act instead obligated the operator to incur such costs. The operator would be able to evade this statutory duty, however, if it combined a pre-hire training requirement with a policy of not paying compensation. The Commission therefore affirmed the ALJ's compensation order so as to prevent the putative undermining of the statutory scheme. Emery thereupon appealed the Commission's decision to the Tenth Circuit.
 
 
 33
 Shortly thereafter, the Secretary issued a memorandum clearly indicating that, notwithstanding the adverse aspect of the Commission's decision in Emery, he continued to interpret the Act broadly to prohibit operators from considering training status when making employment decisions. In relevant part, this 1983 memorandum stated:
 
 
 34
 Operators may not negate the purpose of Section 115 and [C.F.R.] Part 48 through hiring, recall or transfer practices which avoid operator training of miners. Specifically, it is improper for operators to require miners to satisfy all or part of the Part 48 training requirements as a precondition of their employment with the operator. The effect of such practices is to transfer the operators' compliance responsibility for training to the miners. This result is inconsistent with Section 115 of the Act and Part 48, and may lead to enforcement action by MSHA. However, MSHA recognizes that applicants for employment may voluntarily acquire training prior to application for employment and that various states require and conduct training for miners. Training received in this manner is consistent with operators' training responsibility under Part 48.
 
 
 35
 * * *
 
 
 36
 Operators should also be aware that it is improper to make decisions to hire, recall or transfer miners based on the amount of Part 48 training the miner needs. Operators cannot systematically bypass miners who would otherwise be hired, recalled or transferred because the miner requires more Part 48 training than other miners. These practices may also lead to enforcement action by MSHA.
 
 
 37
 Operators should be aware the MSHA policy in this area has been reviewed in light of the recent Federal Mine Safety and Health Review Commission decision in Secretary of Labor on Behalf of Bennett, et al. v. Emery Mining Corp. The purpose of the policy statement is to provide timely notice to operators and miners of MSHA's policy in this area.
 
 
 38
 MSHA Policy Memorandum No. 83-28C (October 31, 1983), reprinted in J.A. in Jim Walter cases, Vol. I, at 7-8.
 
 
 39
 In order to enforce the Act as he thus broadly interpreted it in the 1983 memorandum, the Secretary instituted in 1983 and 1984 these proceedings against Peabody and Jim Walter. The ALJ assigned to the Peabody cases ruled in favor of the Secretary, holding that the laid-off individuals qualified as "miners" under section 3(g), and that section 105(c)(1) prohibited their being bypassed on account of their training status:
 
 
 40
 The laid off miner clearly is more than just a preferred job applicant. I conclude that the rights accorded a laid off miner under the collective bargaining agreement contain indicia of an ongoing employment relationship sufficient for him to be considered a miner within the purview of sections 115 and 105(c) of the Act. I have not overlooked the definition of "miner" in section 3(g) of the Act. In view of the pertinent provisions of the collective bargaining agreement and the overriding purposes of the training provisions of the Act, I conclude that for present purposes, the laid off miner must be considered an individual working in a coal mine. That is where he would be if not for an interruption caused through no fault of his own.
 
 
 41
 United Mine Workers of America ex rel. Rowe v. Peabody Coal Co., 6 FMSHRC 1634, 1648 (July 1984) (ALJ), rev'd, 7 FMSHRC 1357 (September 1985). In so holding, the ALJ here rejected the holding of the ALJ in Shepard and distinguished the Commission's decision in Emery, arguing that the new hires in Emery, unlike the laid-off individuals of Peabody, "were 'strangers' in that they had no previous relationship with the industry or the employer." Id. at 1648. The ALJ therefore concluded that those on layoff were entitled to employer-provided training under section 115, and that Peabody discriminated against them in violation of section 105(c)(1) when it refused to recall them.
 
 
 42
 The ALJ assigned to the Jim Walter cases, however, rejected the Secretary's argument that the recall policy was discriminatory under section 105(c)(1). Secretary of Labor ex rel. Acton and UMWA v. Jim Walter Resources, 6 FMSHRC 2450 (October 1984) (ALJ), aff'd, 7 FMSHRC 1348 (September 1985). Disagreeing with the ALJ in Peabody, he determined that the Commission's analysis in Emery of the term "miner" applied to laid-off individuals as well as to new hires:
 
 
 43
 Within this legal framework, it is therefore immaterial whether the affected applicants for employment are "strangers" to the industry and the employer, as in the Emery case, or are former employees awaiting the possibility of reemployment from a recall list, as in the instant case. In either case, preemployment training and experience criteria may be used by the mine operator, including the requirement that prospective underground miners have completed their MSHA-approved safety training, without running afoul of the Act.
 
 
 44
 Id. at 2453. Since he believed that the Act permitted an operator to consider training status in making employment decisions, the Jim Walter ALJ concluded it was also permissible for collective bargaining agreements to condition recall rights on the satisfaction of MSHA training requirements (although he declined to decide whether the Agreement imposed such a condition). The ALJ therefore refused to order Jim Walter to recall the by-passed individuals. Applying the Commission's ruling in Emery, however, he did order Jim Walter to compensate recalled employees for their time in, and the costs, of pre-hire training.
 
 
 45
 The Commission addressed the Peabody and Jim Walter appeals in opinions decided the same day. Secretary of Labor ex rel. Acton and UMWA v. Jim Walter Resources, 7 FMSHRC 1348 (September 1985); United Mine Workers of America ex rel. Rowe v. Peabody Coal Co., 7 FMSHRC 1357 (September 1985). The Commission began its analysis by noting that
 
 
 46
 the Act and its legislative history do not address the rights of laid-off individuals or the obligations of operators with regard to the recall of laid-off individuals. Section 115 contains no priorities with respect to the recall of former employees. Moreover, nothing in the legislative history indicates that Congress intended section 115 to dictate to operators whom they must recall--any more than it dictates whom they must hire.
 
 
 47
 Peabody Coal, 7 FMSHRC at 1363. The Commission then addressed whether the recall policy was discriminatory under section 105(c)(1) and, as in Emery, rejected the Secretary's contention that the affected individuals were "miners":
 
 
 48
 Section 115 grants training rights to "new miners" and "miners." We conclude that, consistent with the rationale underlying Emery, under the Mine Act it is upon being rehired that laid-off individuals become entitled to the rights granted by section 115. At that point they once again become "miners" within the meaning of section 115 and as defined section 3(g) of the Act.
 
 
 49
 Id. (footnote omitted). The Commission therefore concluded that, "there being no statutory right to training for those on layoff status, refusal to rehire for lack of required training does not violate section 105(c)." Id. Following its position in Emery, however, the Commission ordered Jim Walter to compensate recalled employees for pre-hire training. Jim Walter Resources, 7 FMSHRC at 1354.
 
 
 50
 Prior to briefing and oral argument before this court, the Tenth Circuit issued its decision in the Emery appeal. Emery Mining Corp. v. Secretary of Labor, 783 F.2d 155 (10th Cir.1986). Although the court reversed the Commission's order requiring Emery to compensate for prehire training, it did so because it agreed with the Commission's reasoning in rejecting the Secretary's contention that the job applicants were "miners" under section 3(g):
 
 
 51
 We cannot infer legislative provisions out of silence. The parties concede that none of the "otherwise extensive regulations" or the Act itself addresses the issue before us. The Act requires training for "new miners," and it defines "miners" as "individuals working in a coal or other mine." None of the twelve complainants were "miners" under the Act or employed by Emery at the time they undertook their training. When, as here, a statute is clear on its face, we cannot expand the Act beyond its plain meaning.
 
 
 52
 Id. at 159 (citation omitted).
 
 V. THE SECRETARY'S ARGUMENT ON APPEAL
 
 53
 As the history of the relevant case law indicates, the Secretary's argument that section 105(c)(1) of the Act prohibits operators from considering MSHA training in making hiring decisions has repeatedly been rejected.[38] In each case, he has lost on his essential point that individuals are "miners" even before they are hired. Prior to losing before the Tenth Circuit, however, the Secretary had consistently maintained, as he stated in the 1983 memorandum, that the Act prohibited operators from considering training status in making all employment decisions; it did not matter, for example, whether a job applicant was a new hire or had been laid-off and was awaiting recall. The Secretary therefore embraced a very broad interpretation of the term "miner", in contrast to the narrower interpretations offered by the Commission (one becomes a "miner" only upon being hired) and by the ALJ who presided over the Peabody cases below (one remains a "miner" while on layoff where there are sufficient "indicia of an ongoing employment relationship").
 
 
 54
 In its Emery decision, the Tenth Circuit soundly rejected the Secretary's broad interpretation of the term "miner." When turning his attention to the appeal before us, therefore, the Secretary was seemingly confronted with a difficult choice. If he held steadfast to his broad interpretation of "miner," the Secretary would have to persuade us to reject the Tenth Circuit's analysis. A less risky undertaking would be to distinguish Emery from this case, as did the ALJ in the Peabody cases below, by arguing that the "ongoing employment relationship" between the operators and individuals on layoff qualified the latter as "miners," whereas the new hires in Emery had formerly been "strangers" to the mining industry.
 
 
 55
 In fact, the Secretary has taken neither approach in this court. Instead, he has tried to distinguish Emery without adopting the ALJ's distinction. On the contrary, the Secretary has joined the Commission in rejecting that distinction:
 
 
 56
 The Secretary agrees completely with the Commission in its reading of the term "miner," i.e., that miners on layoff do not possess a right to receive Section 115 training during the course of the layoff. However, any safety and health training required under the Act is appropriately given after the miner is recalled and before he begins work. In other words, individuals become "miners" when they are recalled, not when they physically report to work. Congress expected operators to make their employment decisions without reference to federal training status, and then supply any necessary training. After being recalled, laid-off "individuals" are again "miners" within the meaning of Sections 3(g) and 115 who are then due to receive the requisite training before going to work.
 
 
 57
 Brief for Appellant Secretary of Labor, at 37.
 
 
 58
 As this passage makes clear, although the Secretary adopted the Commission's interpretation of "miner," he nonetheless ignored the seemingly inevitable conclusion that, because the passed over "individuals" were not recalled (at least not until they obtained "new miner" training on their own), they did not qualify as "miners" under section 115 and therefore could not have been discriminated against in violation of section 105(c)(1).[39] It is not unlikely that, after submitting his briefs, the Secretary realized this deficiency, for at oral argument he further refined his interpretation of the term "miner," realigning himself somewhere between the Commission and the ALJ in the Peabody cases:
 
 
 59
 Secretary: ... these complainants were "miners" even under a literal application of the definitional term at the time that they required training. By contract, when they reached the top of the recall list, they were entitled to the job, and at that point Section 115 came into play and they were--
 
 
 60
 Court: Excuse me. At what point: when they reached the top of the recall list or when they had been recalled?
 
 
 61
 Secretary: Well, when they reached the top of the recall list, they were entitled as a matter of contract to employment.
 
 
 62
 * * *
 
 
 63
 During the time that they are on the layoff, they have no right to receive the training. But once they reach the top of the recall list, they are recalled, and they have the right, at that point, to receive the training.
 
 
 64
 Court: But I thought that the argument was that they were not recalled.
 
 
 65
 Secretary: They are recalled at the time that they reach the top of the recall list.
 
 
 66
 Fleshing out this rather cryptic argument, the Secretary's most recent interpretation of sections 105(c)(1) and 115 seems to run like this: (1) while laid-off and ranked second or lower on the recall list, individuals are not "miners" (contrary to the position of the Peabody ALJ), (2) but when they "reach the top of the recall list," they are "entitled as a matter of contract to employment" and therefore once again become "miners," (3) and are entitled by section 115(a) of the Act to receive safety training. Therefore, (4) reaching the top of the recall list without having obtained training independently is equivalent to a "miner's" "exercising" his or her statutory right to training, thereby (5) prompting the operator, in anticipation, to refuse to recall the "miner" after all, in violation of section 105(c)(1). The argument can be simplified even further without any loss of content: a "miner" under section 3(g) is one who is "contractually entitled to employment"; and to deny that person, on the basis of his or her training status, the employment to which he or she is contractually entitled constitutes unlawful discrimination under section 105(c)(1). The particular attraction to the Secretary of this argument is that it enables him to distinguish the Tenth Circuit's opinion in Emery, because the new hires in that case were clearly not "contractually entitled to employment."
 
 VI. ANALYSIS
 
 67
 As our recounting of the Secretary's position amply illustrates, a prohibition against considering training status in making hiring decisions is not "unambiguously expressed" in section 105(c)(1).[40] Under Chevron U.S.A. Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must therefore determine whether the Secretary "reasonably" interprets section 105(c)(1) to require "training neutral" recall of applicants who are "contractually entitled to employment."[41] In particular, we must determine whether such applicants, by virtue of seeking employment without having first obtained the requisite safety training, have thereby "exercised" "any statutory [training] right" of a "miner." If not, then an operator's refusal to hire them on account of their training status does not violate section 105(c)(1), regardless of whether it violates their contractual rights.
 
 
 68
 In reviewing the Secretary's explanation of why the Act prohibits application of the operators' recall policy to those contractually entitled to employment, we note that the Secretary has offered this interpretation of sections 105 and 115 only during oral argument before this court, and then only in an abbreviated form; we have had to supply some, and to polish other, links in the chain of logic. Neither the Secretary's 1983 memorandum nor his briefs before this court offer a systematic version of this argument, nor has any opinion by an ALJ, the Commission, or a court independently suggested it.[42] We must therefore begin our analysis at the most basic level, by ascertaining the precise nature of the "right" conferred upon a miner by section 115(a).
 
 
 69
 In order to understand the training rights of a miner, we must keep in mind that the Act's overall purpose is to protect "the health and safety of [the coal industry's] most precious resource--the miner,"[43] and that section 115(a) was added in 1977 to guarantee that "[n]o more will miners die because they were not taught the basic fundamentals in self-protection."[44] Section 115 and the Secretary's regulations are consequently structured with this safety goal in mind. This is evident first from the fact that the amount of training a miner must receive depends on the level of risk involved in his or her particular work.[45] Miners who "are to work underground" must receive more training than those who "are to work on the surface," and miners who fall into neither group must receive only generalized "hazard" training.[46] That the paramount goal of the Act is the miner's safety is also obvious from section 104(g)(1), which requires the Secretary to "immediately withdraw[ ] from the ... mine" any person that he "find[s] employed at a ... mine ... who has not received the requisite safety training."[47]
 
 
 70
 Sections 115(a) and 104(g)(1) of the Act therefore confer upon a "miner" the right not to "work" or to be "employed" in the mines without having first received the requisite training. Put more simply, the Act accords a miner the right not to be placed in a dangerous environment without the benefit of proper safety training.[48] In order to protect this central statutory right, Congress in 1977 amended section 105(c)(1) and inserted section 104(g)(2), thereby conferring upon a miner the corollary right not to be discharged or otherwise discriminated against either when he or she exercises the right by refusing to work without having received the required training[49] or when the Secretary issues an order withdrawing that miner from the mine.[50]
 
 
 71
 In light of this analysis of the training rights afforded under the Act, we must assess the Secretary's argument that individuals who are contractually entitled to employment but who fail to obtain safety training and are then refused employment are discriminated against in violation of section 105(c)(1) "because of [their] exercise" of the training rights granted under section 115(a). Since, as we have seen, these rights are granted only to statutory "miners," i.e., to persons who "work" or are "employed" in the mines, the Secretary's section 105(c)(1) argument can stand only if it is reasonable to conclude that laid-off individuals qualify as such "miners," or if, in refusing to obtain training, they somehow exercise the training rights of other individuals who are "miners."
 
 
 72
 The Peabody ALJ held that the laid-off individuals were themselves "miners," reasoning that "the rights accorded a laid off miner under the collective bargaining agreement contain indicia of an ongoing employment relationship sufficient for him to be considered a miner within the purview of sections 115 and 105(c) of the Act." Peabody Coal, 6 FMSHRC at 1648. Both the Commission and the Secretary have rejected this argument, and we agree with them. Congress enacted section 115(a) in order to create a safe and healthy work environment, but individuals while on layoff simply are not exposed to that environment. Requiring that such individuals receive safety training would therefore serve no statutory purpose, even if they have statutory or contractual rights that preclude their being considered "strangers," for some other purpose, to the mining industry or to the particular operator that laid them off. Thus, the Secretary has properly concluded that "miners on layoff do not possess a right to receive Section 115 training during the course of the layoff."[51]
 
 
 73
 For the same reason, however, we must reject the Secretary's suggestion that laid-off individuals attain a training right under section 115(a) when they become "contractually entitled to employment," which according to the Secretary transforms those on layoff into "miners." When the Secretary unveiled this interpretation of the statutory term "miner" during oral argument, he did not explain how this contractual entitlement relates to the statutory definition of a "miner" as "any individual working in a ... mine." We certainly cannot infer from the Act that Congress intended privately-bargained contracts to determine who is or is not a miner entitled to receive the section 115 safety training. First, it was the failure of contract to ensure the safety and health of miners that impelled Congress to impose the section 115 training requirements and the "mandatory safety and health standards" found elsewhere in the Act. Second, it would be peculiar in the extreme for us to import a contractual criterion to determine who is entitled to training when the Congress has explicitly considered the question and decreed a statutory criterion. Thus, it is difficult to understand why the Secretary believes that those at the top of the recall list, even assuming they are "contractually entitled to employment,"[52] are "miners" with a right to training, but that those individuals who are either lower on the list or else are "strangers" to the mining industry (e.g., the applicants in Emery ) are not "miners" and therefore have no right to training.
 
 
 74
 The only possible explanation we can supply for this contract-based distinction is that perhaps, in the Secretary's view, the contractual entitlement to employment makes it sufficiently certain the individual will imminently be "working" in a mine that it is reasonable to require that he or she receive safety training. Even granting that this proposition is empirically correct, however, it only means that this individual will soon be a "miner," not that he or she is one already; a person cannot "work" in a mine at least until he or she is employed by a mine operator (or is otherwise "engaged in the extraction and production process" or "regularly exposed to mine hazards"[53] ). We therefore join the Commission and the Tenth Circuit in holding that an individual is not a "miner" who can claim a training right under section 115(a) unless he or she is employed in a mine.[54] When they were passed over for recall by Peabody and Jim Walter, the individuals on whose behalf the Secretary is suing were not employed by those operators and obviously did not work in a mine; therefore, as the Commission concluded below, they were not then "miners." Their failure to obtain safety training, which resulted in the operators' refusal to employ them, thus could not constitute any exercise of training rights they then possessed, because prior to being employed they had no such rights.
 
 
 75
 Alternatively, the Secretary argues that, in refusing to obtain safety training, these laid-off individuals were acting on behalf of miners who, at the time they were passed over, were unquestionably working in a mine--in other words, that the laid-off individuals were "exercising" the latter group's training rights. It is not readily apparent, however, how the safety right of working miners--i.e., their right not to be exposed to the dangers inherent in mining without their and their co-workers having received appropriate safety training--is furthered by laid-off individuals outside of the mine environment refusing to obtain that training on their own. The Secretary offers a possible explanation. He contends that employer-provided safety training is superior to training provided by others, and that consequently the Act embodies an implicit preference for the former. Because the obvious effect of the operators' recall policy is to remove from them the burden of providing the actual training (even if they must provide compensation), the Secretary contends that the policy "contravenes the purpose of Section 115 in that it permits miners with less than the best possible training to work in the mines."[55] The Secretary therefore argues that the laid-off individuals' refusal to obtain training furthers the training rights of those currently working in the mine by preventing someone with inadequate training from entering the mine and working beside them. In a way, this refusal to obtain training also furthers the laid-off individuals' own future training rights because upon being rehired they will become "miners," and if they then enter the mines with inadequate pre-hire training, their rights under the Act will be violated.
 
 
 76
 This entire argument rests on the notion that only employer-provided training satisfies the Act's training requirements. This contention derives no explicit support from the Act itself, however. On the contrary, the Secretary's own regulations permit parties other than the direct employers ("State or other Federal agencies, or associations of mine operators, miners' representatives, other mine operators, private associations, or educational institutions") to provide the required training.[56] In this case, Jim Walter and Peabody hired individuals who had obtained training from just such sources, and the Secretary does not allege that these instructors lacked the necessary MSHA approval.[57] He therefore cannot reasonably argue that the refusal by laid-off individuals to obtain pre-hire training had the effect of improving mine safety and thereby furthering the training rights of individuals who work in mines.
 
 
 77
 The Secretary makes one further argument. Relying on those provisions in section 115(b) and the MSHA regulations that impose training costs upon the operator, the Secretary argues that the Act grants miners not only a right to obtain safety training, but also a right to obtain that training at no direct expense to themselves. The Commission agreed with the Secretary, holding that Jim Walter's no-compensation policy violated the "rights" of those individuals who were rehired. Because Jim Walter has not appealed the Commission's compensation order, we do not reach the question whether, even if the recall policy is proper, an operator must still compensate those recalled for the training that the operator would have otherwise needed to provide. We therefore express no opinion on the Tenth Circuit's holding in Emery that operators need not provide compensation. Since our holding does not preclude a subsequent ruling that an operator must provide compensation, this argument by the Secretary--that the recall policy itself must fall because it impermissibly shifts training costs from operators onto miners--is inapposite.[58]
 
 
 78
 Finally, we note with interest that the prohibition in section 105(c)(1) against discrimination "because of the exercise by [a] miner ... on behalf of himself or others of any statutory right afforded by this chapter" mirrors almost exactly that found in section 11(c)(1) of the Occupational Safety and Health Act of 1970, upon which the Secretary some years ago had relied in promulgating a regulation prohibiting discrimination against workers who refuse to work in conditions that, in good faith, they reasonably believe may cause serious injury.[59] 9] The terms of the Federal Mine Safety and Health Amendments Act of 1977, as well as its legislative history, clearly indicate that Congress simply wanted to apply a similar anti-discrimination provision to the mining context.[60]
 
 
 79
 We therefore hold that the Secretary has not offered a "reasonable" interpretation of sections 105(c)(1) and 115(a) that renders the operators' recall policy unlawful. Although, as we have indicated, the Secretary's explication before us of how he interprets the Act has been less than exemplary, in the final analysis the problem with the proffered interpretation lies not in the Secretary's presentation, but in the Act itself. Neither the language Congress employed nor the legislative history supports the Secretary's contention that Congress intended to require "training neutral" hiring.
 
 VII. CONCLUSION
 
 80
 The laid-off individuals in this case did not, in failing to obtain safety training, exercise any right granted a miner by section 115(a). As a result, the Secretary's position--that the operator refused to employ them "because of [their] exercise ... of [a] statutory right," and thus engaged in prohibited discrimination--is not a reasonable interpretation of sections 105(c)(1) and 115(a). The decision of the Commission not to issue recall and back-pay orders must stand.
 
 
 81
 For the reasons stated above, the Commission's orders are
 
 
 82
 Affirmed.
 
 RUTH BADER GINSBURG, concurring:
 
 83
 I concur in the judgment and in much of the court's reasoning. However, I would rest rejection of the Secretary's position not on the section defining "miner," section 3(g), 30 U.S.C. Sec. 802(g), but solely on the language and structure of section 115, 30 U.S.C. Sec. 825.
 
 
 84
 One need not exclude "laid-off miners," see Court's Opinion at 1136, from the 3(g) definition of "miner" for all purposes in order to resolve this case, and I do not believe the panel intended or has made so sweeping a disposition.[1] See Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932) ("[The] natural presumption that identical words used in different parts of the same act are intended to have the same meaning ... is not rigid[.] ... Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different ... the meaning well may vary to meet the purposes of the law...."); see also Bituminous Coal Operators Ass'n v. Hathaway, 406 F.Supp. 371, 375 (W.D.Va.1975) (although same definitions of words "coal mine" and "operator" appear in all four titles of Federal Coal Mine Health and Safety Act of 1969, titles II and III are "distinct from title IV with respect to their specific remedial purpose"; construction applied to title IV definitions "need not be mechanically applied to all titles of the Act"), aff'd, 547 F.2d 240 (4th Cir.1977).[2] While section 3(g), I believe, does not carry the day for the coal mine operators, the Secretary's attempt to locate in the Act a "training-neutral" recall requirement founders on section 115 itself. See Court's Opinion at 1146-1147, 1147, 1148, and 1149-1150. The word "miner," as employed in that particular section, is not reasonably read to encompass persons laid-off.
 
 Section 115(a) states, inter alia:
 
 85
 (1) new miners having no underground mining experience shall receive no less than 40 hours of training if they are to work underground....
 
 
 86
 (2) new miners having no surface mining experience shall receive no less than 24 hours of training if they are to work on the surface....
 
 
 87
 (4) any miner who is reassigned to a new task in which he has no previous work experience shall receive training in accordance with a training plan approved by the Secretary....
 
 
 88
 30 U.S.C. Sec. 825 (emphasis added). These provisions are directed to miners on the job; they are not comprehensibly read to accommodate those who stand and wait. Section 115(a) further provides:
 
 
 89
 (3) all miners shall receive no less than eight hours of refresher training no less frequently than once every 12 months....
 
 
 90
 Id. If laid-off miners fit the section 115(a) description, then operators would be required to provide refresher training to any individual whose name remains at the top of the recall list for 12 months, a costly imposition that does not efficiently serve the Act's overall purpose of ensuring that "no more will miners die because they were not taught the basic fundamentals in self-protection." Court's Opinion at 1146.[3]
 
 
 91
 Finally, I note the Peabody ALJ's observation that the Commission's position, which we uphold, hurts those Congress sought to protect. See UMWA on behalf of Rowe et al. v. Peabody Coal Co., 6 FMSHRC 1634, 1647 (1984) (denying recall to persons who lack current generic safety training "perversely transform[s]" statutory provisions designed to protect miners into "unforeseen and crippling liabilities ... [whose effect] would not be to help and protect but rather to hurt and harm"). Laid-off individuals must obtain and pay for training on their own if they wish to be reemployed. Even if there is compensation on rehire, those who are not rehired will gain no return from the training for which they paid; instead, their time and money will disappear down the proverbial drain.[4] Prime beneficiaries of this system, it appears, are the training institutions whose enrollments will increase, but I doubt that such entities fall within the center of the legislators' "zone of interest." Congressional attention to this matter may well be in order.[5]
 
 
 
 [1]
 MSHA is an agency within the Department of Labor, through which the Secretary performs his duties under the Act
 
 
 [2]
 Jim Walter contends that some of the bypassed individuals would not have been rehired because they lacked the necessary training required under the express terms of the collective bargaining agreement. The record indicates that Jim Walter's position was upheld in arbitration. Joint Appendix (J.A.) in Jim Walter cases, Vol. I, at 146, 173
 
 
 [3]
 The Commission also held, in agreement with the Secretary, that Jim Walter violated the Act by failing to compensate recalled miners for the training they had obtained while laid-off, and which Jim Walter required as a condition for recall. (Peabody, on the other hand, did provide such compensation.) Jim Walter has not appealed the compensation order, and we express no opinion on the merits of the Commission's holding. We note, however, that the Tenth Circuit has reversed the Commission on this point. See Emery Mining Corp. v. Secretary of Labor, 783 F.2d 155 (10th Cir.1986)
 
 
 [4]
 Pub.L. 91-173, 83 Stat. 742 (1969), codified at 30 U.S.C. Sec. 801 et seq. (1976)
 
 
 [5]
 Pub.L. 95-164, 91 Stat. 1290 (1977), codified (as amended) at 30 U.S.C. Sec. 801 et seq. (1982)
 
 
 [6]
 30 U.S.C. Sec. 825
 
 
 [7]
 Id. Sec. 802(g)
 
 
 [8]
 Section 115(a)(1)-(2) of the Act, 30 U.S.C. Sec. 825(a)(1)-(2)
 
 
 [9]
 Section 115(a)(3) of the Act, 30 U.S.C. Sec. 825(a)(3)
 
 
 [10]
 30 U.S.C. Sec. 825(b)
 
 
 [11]
 Section 104(g)(1) of the Act, 30 U.S.C. Sec. 814(g)(1)
 
 
 [12]
 See 30 C.F.R. Part 48 (1986). The notice of rulemaking is found at 43 Fed.Reg. 47,454 (October 13, 1978)
 
 
 [13]
 See section 115(a) of the Act, 30 U.S.C. Sec. 825(a); 30 C.F.R. Secs. 48.3, 48.23
 
 
 [14]
 30 C.F.R. Sec. 48.2(a)(1)
 
 
 [15]
 Id. Sec. 48.22(a)(1)
 
 
 [16]
 Id. Sec. 48.2(b)
 
 
 [17]
 Id. Sec. 48.22(b)
 
 
 [18]
 Id. Secs. 48.2(c), 48.22(c)
 
 
 [19]
 For a more detailed description of the training requirements in the Act and MSHA regulations, see National Indus. Sand Ass'n v. Marshall, 601 F.2d 689 (3rd Cir.1979)
 
 
 [20]
 30 C.F.R. Sec. 48.5(a)
 
 
 [21]
 Id. Sec. 48.8(a)
 
 
 [22]
 Id. Sec. 48.6
 
 
 [23]
 Id. Sec. 48.7
 
 
 [24]
 Id. Sec. 48.25(a)
 
 
 [25]
 Id. Sec. 48.28(a)
 
 
 [26]
 Id. Sec. 48.26
 
 
 [27]
 Id. Sec. 48.27
 
 
 [28]
 Id. Secs. 48.4, 48.24
 
 
 [29]
 Id. Secs. 48.10, 48.30
 
 
 [30]
 30 U.S.C. Sec. 815(c)(1) (emphasis added)
 
 
 [31]
 The Secretary claims that not all laid-off individuals actually received this letter, but he did not rely on this fact before the Commission
 
 
 [32]
 In relevant part, the letter states:
 RE: MAINTENANCE OF STATE AND/OR FEDERAL MINE CERTIFICATION
 Federal and State Law requires that employees meet minimum standards prior to starting work in the mines, or prior to resuming work after having been laid off for specified periods. Effective immediately, if you are laid off from any Peabody facility, it is your responsibility to keep your certification current. The only exception to this policy will be General Refresher Training for the current year in which you are recalled. Failure to keep this certification up-to-date means that you will be bypassed for recall in favor of panel members who do have current certification.
 ... The required training is available through the State Vocational School, and the State Department of Mines and Minerals at Madisonville, Kentucky and elsewhere. It is your responsibility to notify Peabody Coal Company once you have completed such training.
 J.A. in Peabody cases, at 87 (footnote omitted). The notice went on to describe both the MSHA and the Kentucky training requirements for surface and underground miners.
 
 
 [33]
 See 30 C.F.R. Secs. 48.5(a), 48.25(a). The individuals bypassed by Peabody had formerly been underground miners, seeking recall as surface miners. As such, they required the "new miner" training required for surface work. The individuals bypassed by Jim Walter presented precisely the opposite situation, having been surface miners who sought recall as underground miners
 
 
 [34]
 See Reply Brief for Appellant Secretary of Labor, at 16-17:
 The Mine Act safety and health training requirements should not enter into the employment relationship or, in this case, alter the collectively-bargained balance except to the extent that Congress allocated federal training rights and responsibilities. The Section 115 training requirements were intended to equip miners, at the direction and expense of mine operators, with a knowledge of fundamental safety and health principles and practices. The training requirements otherwise were intended to be neutral. No other impact on the employment relationship was intended. Adverse impact on miners as the result of Section 115 was expressly disapproved. The neutrality that Congress intended is achieved if the need for federal training does not play a part in employment decisions--in this case if the seniority provisions of the collective bargaining agreement are applied without regard to federal training needs. Absent the Mine Act training requirements, each complainant in this case would have been recalled at the time of his bypass. Because federal training was not intended to burden miners in any manner, this is the result that should prevail.
 
 
 [35]
 30 U.S.C. Sec. 815(c)(1); see text at note 30, supra. The Secretary has not alleged that the operators bypassed these individuals for any of the other reasons listed in section 105(c)(1)
 
 
 [36]
 Definitions of "underground miner" ("any person working in an underground mine ...") and "surface miner" (any person working in a surface mine or surface areas of an underground mine ...") in the MSHA regulations add the qualification that the person actually be "engaged in the extraction and production process," or alternatively require that the person be "regularly exposed to mine hazards." 30 C.F.R. Secs. 48.2(a)(1), 48.22(a)(1)
 
 
 [37]
 Unlike this case, the Secretary did not sue on behalf of any applicants rejected for lack of training
 
 
 [38]
 The Secretary's victories have come only in two subsequently reversed ALJ decisions
 
 
 [39]
 Section 105(c)(1) protects "applicants for employment" as well as "miners" from discrimination "because of [their] exercise ... of a statutory right," but only "miners" have training rights under section 115(a). Consequently, a job applicant can be discriminated against for having exercised his or her training rights only if he or she had previously been a miner or alternatively, if we accept the Secretary's theory is a miner even before being rehired and exercises training rights by failing to obtain pre-hire training. (In this case, the Secretary has not asserted that the operators passed over any of the individuals before us because of an exercise of training rights during previous employment.)
 
 
 [40]
 Section 105(c)(1) therefore differs from provisions in other statutes that clearly prohibit discrimination in hiring based upon specified criteria. See section 703(a)(1) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2(a)(1) (1982); section 4(a) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 623(a). Cf. section 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(a)(3). In fact, section 105(c)(1) much more closely resembles the cognate antidiscrimination provisions in those statutes, and of the Occupational Safety and Health Act of 1970 (OSHA), that prohibit discrimination based upon the exercise of rights found elsewhere in the same statute. Preventing such discrimination is not a goal in itself but a necessary adjunct to secure the rights at the core of the statute. See section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000(e)-3(a); section 4(d) of the ADEA, 29 U.S.C. Sec. 623(d); section 8(a)(1), (4) of the NLRA, 29 U.S.C. Sec. 158(a)(1), (4); section 11(c)(1) of the OSHA, 29 U.S.C. Sec. 660(c)(1)
 
 
 [41]
 We accord Chevron deference to the Secretary's, not the Commission's, interpretation of the Act. See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 537 (D.C.Cir.1986); Donovan v. Carolina Stalite Co., 734 F.2d 1547, 1552 (D.C.Cir.1984)
 
 
 [42]
 This court's prior occasions for interpreting section 3(g) offer little guidance on the problem before us, although each case involved section 105(c)(1). In Donovan v. Stafford Construction Co., 732 F.2d 954, 958 (D.C.Cir.1984), we held that a secretary employed at the mine was a "miner"--"even though she was not directly involved in the extraction process"--and thus was protected by the prohibition against discrimination for having filed a complaint or testified concerning a statutory violation. Most recently, we held in Paul v. Federal Mine Safety and Health Review Com'n, 812 F.2d 717 (D.C.Cir.1987), that a professional mining engineer was not a "miner" because he worked at a site that, although under development, did not yet qualify as a "mine" under section 3(h)(1). Accordingly, he was not entitled to the section 105(c)(1) protection accorded the secretary in Stafford
 
 
 [43]
 Section 2(a) of the Act, 30 U.S.C. Sec. 801(a)
 
 
 [44]
 123 Cong.Rec. 35,410 (Oct. 27, 1977) (comments of Congressman Perkins), reprinted in Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977, 1356 (1978)
 
 
 [45]
 See Nat'l Indus. Sand Ass'n v. Marshall, 601 F.2d 689, 705 (3d Cir.1979)
 
 
 [46]
 30 C.F.R. Secs. 48.11, 48.31. The class of "miners" who must receive "hazard" training "includes any delivery, office, or scientific workers, or occasional, short term maintenance or service workers contracted by the operator, and any student engaged in academic projects involving his or her extended presence at the mine." Id. Secs. 48.2(a)(2), 48.22(a)(2)
 The notice of rulemaking that promulgated the training regulations stated that:
 With respect to surface operations ... only those workers who are regularly exposed to the many hazards associated with the mining industry need receive the full range of training. It is those workers who Congress sought to insure would be fully apprised of those hazards and familiarized with safe work practices at the time work duties begin.... MSHA generally believes that the same distinctions ... are also applicable to underground miners.
 
 
 [43]
 Fed.Reg. 47,454, 47,454-55 (October 13, 1978)
 
 
 [47]
 30 U.S.C. Sec. 814(g)(1)
 
 
 [48]
 The Commission recognized this point in its opinion below: "The Act's concerns are the health and the safety of the nation's miners. In enacting section 115 Congress was intent upon preventing 'the presence of miners ... in a dangerous mine environment who have not had ... training in self preservation and safety practices.' " Peabody Coal, 7 FMSHRC at 1364, quoting S.Rep.No. 95-181, 95th Cong., 1st Sess., 50 (1977), reprinted in Legislative History of the Federal Mine Safety and Health Act of 1977, at 637-38
 
 
 [49]
 Under the Coal Act, which prohibited only discrimination for filing a complaint or testifying, it was unclear whether a miner had a right to refuse to work under conditions that violated the safety and health standards of the statute. This court found such a right, see Munsey v. Morton, 507 F.2d 1202, 1207-11 (D.C.Cir.1974); Phillips v. Interior Bd. of Mine Operations Appeals, 500 F.2d 772, 777-783 (D.C.Cir.1974), cert. denied sub nom. Kentucky Carbon Corp. v. Interior Bd. of Mine Operations Appeals, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975), but another court did not. See Southern Ohio Coal Co. v. Federal Mine Safety and Health Review Com'n, 716 F.2d 1105, 1108-09 (6th Cir.1983)
 The statute was clarified when the prohibition against discrimination "because of the exercise by [a] miner ... of any statutory right" was inserted by Congress in 1977. The committee report accompanying the Senate bill states that the language was intended to clarify that miners had a right to refuse to work under unsafe conditions:
 This section is intended to give miners, their representatives, and applicants, the right to refuse to work in conditions they believe to be unsafe or unhealthful and to refuse to comply if their employers order them to violate a safety and health standard promulgated under the law. The Committee intends to insure the continuing vitality of the various judicial interpretations of section 110 of the Coal Act which are consistent with the broad protections of the bill's provisions; See, e.g., Phillips v. IBMA, 500 F.2d 772; Munsey v. Morton, 507 F.2d 1202. The Committee also intends to cover within the ambit of this protection any discrimination against a miner which is the result of the safety training provisions of [what eventually became section 115] or the enforcement of those provisions under [what eventually became section 104(g) ].
 S.Rep. No. 95-181, at 36, U.S.Code Cong. & Admin. News 1977, pp. 3401, 3436, reprinted in Legislative History of the Federal Mine Safety and Health Act of 1977, at 624. See Brock v. Metric Constructors Co., 766 F.2d 469, 471-72 (11th Cir.1985); Miller v. Federal Mine Safety and Health Review Com'n, 687 F.2d 194, 195 (7th Cir.1982); Consolidation Coal Co. v. Marshall, 663 F.2d 1211, 1216-1217 n. 6 (3rd. Cir.1981).
 The Secretary relies on the final sentence of the passage quoted above to support his contention that the Act requires "training neutral" hiring. The Senate committee's language does not go so far, however; it merely provides that the Committee intended the anti-discrimination provision being added in 1977 to apply with respect to the training requirements that were being imposed at the same time, and not only with respect to the safety and health standards in effect at the time of Phillips and Munsey. The dispute in this case is not whether operators may discriminate against miners who exercise their training rights; rather, the issue is whether in passing over untrained individuals the operators so discriminated. The legislative history says nothing on this point.
 
 
 [50]
 Section 104(g)(2), 30 U.S.C. Sec. 814(g)(2), states in relevant part that "[n]o miner who is ordered withdrawn from a ... mine under paragraph (1) shall be discharged or otherwise discriminated against because of such order."
 
 
 [51]
 Brief for Appellant Secretary of Labor, at 37
 
 
 [52]
 The UMWA has consistently lost in arbitration proceedings when seeking a ruling that the Agreement itself, apart from the Act, requires "training neutral" hiring. See Jim Walter Resources, 7 FMSHRC at 1353 n. 5; Peabody Coal, 7 FMSHRC at 1364 & n. 7. The Secretary argues that "the Commission decisions impermissibly deferred to a presumed arbitral holding that the contract permitted Mine Act training status to be used as a criterion for recall decisions." Supplemental Brief for Appellant Secretary of Labor, at 7. The Secretary reads the Commission decisions too grudgingly, however. Based on its own reading, the Commission held that the Act did not expressly prohibit operators from considering training status in hiring and that such a policy did not constitute unlawful discrimination under section 105(c)(1). Only after concluding that the operators' policies did not violate the Act did the Commission note that arbitrators had ruled that these policies do not violate the Agreement
 
 
 [53]
 The regulations define underground miner and surface miner as "any person working in a ... mine and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards." See text accompanying notes 14-15, supra
 
 
 [54]
 In concluding that the laid-off individuals in this case were not "miners" because they were not as yet employed by either Peabody or Jim Walter, we do not suggest that the term "miner" includes only employees of operators. The Secretary requires "underground" and "surface" training for all individuals who are "working in a mine," including operators themselves and employees of a contractor. Courts have held that an individual within either group qualifies as a miner so long as he or she works in a mine. See National Indus. Sand Ass'n v. Marshall, 601 F.2d 689, 701, 704 (3rd Cir.1979) (employee of contractor); Marshall v. Kraynak, 604 F.2d 231 (3rd Cir.1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 643 (1980) (miner-operator); Marshall v. Conway, 491 F.Supp. 1123, 1125 (E.D.Pa.1980) (same); Marshall v. Donofrio, 465 F.Supp. 838, 840 (E.D.Pa.1978), aff'd, 605 F.2d 1194, 1196 (3rd Cir.1979), cert. denied, 444 U.S. 1102 (1980) (same)
 We have no reason to disagree with the statement by the court in National Indus. Sand Ass'n that "the statute looks to whether one works in a mine, not whether one is an employee or nonemployee or whether one is involved in extraction or nonextraction operations." 601 F.2d at 704 (emphasis in original). In the case before us, however, re-employment was a necessary pre-condition for the individuals on layoff to be "working in a mine." Thus, the fact that the operators had denied them re-employment precluded them from being miners at the relevant time.
 
 
 [55]
 Brief for Appellant Secretary of Labor, at 27
 
 
 [56]
 30 C.F.R. Secs. 48.4(a), 48.24(a). The Secretary's 1983 memorandum states similarly that "applicants for employment may voluntarily acquire training prior to application for employment," and that "[t]raining received in this manner is consistent with operators' training responsibility." The Senate committee report also took this position:
 The Committee recognizes that some States, namely West Virginia and Kentucky, provide pre-employment training to individuals who may apply for jobs as miners. Such training may meet the requirements of the standards promulgated by the Secretary, and, assuming that such training is of sufficient quality, the operator should not be required to duplicate State-provided training.
 S.Rep.No. 95-181, at 51, U.S.Code Cong. & Admin.News 1977, p. 3450, reprinted in Legislative History of the Federal Mine Safety and Health Act of 1977, at 639.
 
 
 [57]
 In fact, the Secretary's contention that the pre-employment training obtained by those hired by Peabody and Jim Walter was inadequate is inconsistent with his complaint against Jim Walter seeking for those recalled individuals reimbursement for the cost of the alternative training. If, as the Secretary suggests, non-employer provided training does not satisfy section 115, despite MSHA approval of the instructors, then instead of demanding compensation for those individuals hired by Jim Walter, the Secretary should have immediately withdrawn them from the mines until Jim Walter provided them satisfactory section 115 training. See section 104(g)(1) of the Act, 30 U.S.C. Sec. 814(g)(1). A further possible consequence is that no compensation should be ordered, since the non-employer training would not relieve Jim Walter of any training costs, which was the Secretary's and the Commission's rationale for demanding compensation
 
 
 [58]
 The Secretary also does not explain, and we cannot imagine, why individuals who are "contractually entitled to employment" are statutorily entitled to compensation for pre-hire training, while individuals without such a contractual entitlement who have been hired on the basis of pre-hire training (e.g., those hired in Emery ) would not be entitled to compensation under the same provision of the statute. If no such distinction can be made, then the compensation issue does not support his argument that only those applicants who are "contractually entitled to employment" fall within the definition of a "miner."
 
 
 [59]
 Section 11(c)(1) prohibits discrimination "because of the exercise by [an] employee on behalf of himself or others of any right afforded by this chapter." 29 U.S.C. Sec. 660(c)(1). The Supreme Court unanimously upheld the Secretary's regulation in Whirlpool Corp. v. Marshall, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980)
 
 
 [60]
 See note 49, supra. We express no opinion as to whether, under section 105(c)(1), the miner must have a "reasonable" belief that the Act is being violated, or whether, in order to be protected from discrimination, the miner must concurrently file a complaint about the alleged violation. See Miller v. Federal Mine Safety and Health Review Com'n, 687 F.2d 194, 195-96 (7th Cir.1982)
 
 
 [1]
 See, e.g., Donovan v. Stafford Construction Co., 732 F.2d 954, 958 (D.C.Cir.1984) (noting, in case of alleged discriminatory discharge in violation of section 105(c)(1), 30 U.S.C. Sec. 815(c)(1), that "we have no reason to question the ALJ's holding that [a secretary-bookkeeper employed by a mine operator] was a 'miner' under [section 3(g) ], even though she was not directly involved in the extraction process"); Roberts v. Weinberger, 527 F.2d 600, 601-02 (4th Cir.1975) (holding, in widow's benefit case, that truck operator hauling coal "from the immediate site of its extraction to a tipple where it was processed, graded and loaded into railroad cars" was "indisputabl[y] ... employed in a coal mine"). See also National Industrial Sand Ass'n v. Marshall, 601 F.2d 689, 704 (4th Cir.1979) (Secretary of Labor's regulations defining a "miner" so as to include "any person ... regularly exposed to mine hazards" as well as "maintenance or service worker[s] contracted by the operator to work at the mine for frequent or extended periods," 30 C.F.R. Secs. 48.2(a)(1), 48.22(a)(1), upheld as consistent with the "broad statutory definition[s]" of "miner" and "coal or other mine")
 
 
 [2]
 See Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 YALE L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against.")
 
 
 [3]
 The alternative arguments offered by the Secretary, see Court's Opinion at 1149-1150, amount to a contention that training-neutral hiring is necessary to secure miners' statutory rights to operator-directed and operator-financed training. I agree with my colleagues both that there is no support, in either the Act's language or the Secretary's own regulations, for the claim that "only employer-provided training satisfies the Act's training requirements," id. at 34, and that any "right" to operator-financed training remains wholly unaffected by our decision in this case. Id. at 35
 
 
 [4]
 Further inefficiency will result if a laid-off individual obtains both surface and underground safety training, see Court's Opinion at 1137-1138, so as to maximize his or her chances of recall for any job which may open up. Once recalled, for either a surface or underground position, a portion of that training will have been wasted
 
 
 [5]
 In suggesting that the lawmakers advert to and explicitly address this issue, I do not imply that the matter is simple or easily resolved. The Secretary's position, placing all costs of training on mine operators, I recognize, may itself generate wasteful expenditures--for example, when miners leave their employers for jobs in other industries shortly after their safety and health training program is completed. Cf. Emery Mining Corp. v. Secretary of Labor, 783 F.2d 155, 157 (10th Cir.1986) (accepting as "beyond cavil" operator's claim that bypass policy was "adopted solely for the bona fide and legitimate reason to screen out those persons who were not interested in a mining career[,] thus reducing [operator's] turnover rate")